UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RAYMOND LEWIS,

                             Plaintiff,

        -against-                                              9:18-CV-0012 (LEK/DJS)

JASON HANSON, *et al.*,

                             Defendants.

---

**MEMORANDUM-DECISION AND ORDER**

## I.        INTRODUCTION

Plaintiff Raymond Lewis has sued defendants Jason Hanson, Jason Kearney, John

Kingston, Scott Mere, Zachary Peck, Craig Robideau, Joseph Sharpe, and Bruce Yelich, all of

whom, at the relevant time, were employees of New York State's Department of Corrections and

Community Supervision ("DOCCS"). Dkt. No. 61 ("Amended Complaint").[1] Plaintiff sues under

42 U.S.C. § 1983 and alleges that Defendants violated his civil rights while he was imprisoned at

Bare Hill Correctional Facility ("Bare Hill"). Id.

Now before the Court is a motion to dismiss brought under Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6) by Kearney, Kingston, and Yelich (the "Moving Defendants").

Dkt. Nos. 79 ("Motion to Dismiss"); 79-1 ("Memorandum"). Lewis opposes the Motion to

Dismiss, Dkt. No. 84 ("Opposition"), and Moving Defendants have filed a reply, Dkt. No. 85

---

[1]  Plaintiff filed an initial complaint in this court on January 3, 2018 against Hanson,
Mere, Peck, Sharpe, and two John Doe defendants. Dkt. No. 1 ("Complaint"). After several
defendants filed answers, Plaintiff filed the Amended Complaint on April 11, 2019, in which he
replaced the two John Doe defendants with Kearney, Kingston, Robideau, and Yelich. See Am.
Compl.

("Reply"). For the following reasons, the Court grants in part and denies in part the Motion to Dismiss.

## II. BACKGROUND

At the motion to dismiss stage, the Court draws all facts from the Complaint, and "assumes all factual allegations in the Complaint are true." Colangelo v. Champion Petfoods USA, Inc., No. 18-CV-1228, 2020 WL 777462, at *1 (N.D.N.Y. Feb. 18, 2020) (Kahn, J.) (citing Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 210 (2d Cir. 2012)).

### A. The Parties

Plaintiff is a 59-year-old man who "suffers from a variety of chronic medical conditions, including asthma" and, when the incidents alleged in this lawsuit took place, was imprisoned at Bare Hill. Am. Compl. ¶ 18.

At all relevant times, Kearney, Mere, Peck, Robideau, and Sharpe were correction officers ("C.O.s") at Bare Hill. Id. ¶ 12. Hanson was a correction sergeant and Kingston was a correction lieutenant, both at Bare Hill. Id. ¶¶ 13–14. Finally, Yelich was the Superintendent of Bare Hill. Id. ¶ 15.

### B. Relevant Factual Background

#### 1. The Beating

On April 23, 2016, Hanson and Robideau summoned Plaintiff from his dorm, handcuffed him, and made him lie down in the back of a prisoner transport van. Am. Compl. ¶¶ 19–20. Plaintiff asked what was going on and was told, "Our buddy wants us to give a nigger like you the special treatment." Id. ¶ 20. The van then started driving towards the Special Housing Unit ("SHU") while certain C.O.s, including Hanson and Robideau "stomped on [Plaintiff's] back and punched [him] repeatedly." Id. ¶ 21.

When the van arrived at the SHU, Hanson and Robideau "dragged [Plaintiff] out of the van by his feet," brought him to a room in the SHU, and told him to face the wall. Id. ¶ 22. Sharpe then entered the room, and Hanson told him, "This nigger gets the special treatment because he filed a lawsuit against one of our brothers." Id. ¶ 23. Hanson then struck Plaintiff in the head. Id.

The lawsuit to which Hanson referred had been filed by Plaintiff in June 2015 against Brian Cowan (the "Cowan Lawsuit"), a C.O. at nearby Franklin Correctional Facility. Id. ¶ 24. The Cowan Lawsuit was ongoing in April 2016, when the assault alleged here took place. Id.

After Hanson hit Plaintiff in the head, he and Sharpe "grabbed [Plaintiff], threw him to the floor, and kicked and punched him for approximately 10 minutes." Id. ¶ 25. During this assault, Plaintiff heard either Hanson or Sharpe say, "Let's say he had a weapon," and the other say, "Let's just say he assaulted one of us." Id.

After the beating, the C.O.s uncuffed Plaintiff, removed his clothes, and left him lying naked on the floor for about five minutes. Id. ¶ 26. They then put Plaintiff's underwear back on him and, because Plaintiff was unable to stand on his own, leaned him against the wall. Id. ¶ 27. A nurse arrived and took several photos of Plaintiff's injuries. Id. In great pain from the beating, Plaintiff asked the nurse for some pain medication, but the nurse told Plaintiff he could not get any pain medication "unless he signed up for sick call." Id.

After the nurse left, Hanson ordered that Plaintiff be placed on suicide watch. Id. ¶ 27. Plaintiff was then placed in a cell in the SHU. Id. Before Hanson left, he grabbed Plaintiff by the back of the neck and threatened, "If [I] hear[] anything about this, all this can happen again." Id. ¶ 28. Mere was then assigned to stand guard outside Plaintiff's cell. Id.

### 2. *The Aftermath*

Later that day, Plaintiff began having difficulty breathing and feared he was having an asthma attack. Id. ¶ 29. No C.O.s were nearby, and Plaintiff could not yell because of his breathing trouble, so he began kicking the door. Id. Mere came by about ten minutes later and, after Plaintiff explained that he needed his asthma medicine, Mere said he would "look into it." Id. ¶ 30. After an hour passed and Mere still had not returned, Plaintiff began to kick his cell door again. Id. ¶ 31. An unidentified C.O. arrived at Plaintiff's cell, and Plaintiff again explained that he needed his asthma medicine. Id. The C.O. replied, "People in hell need ice water," and walked away. Id. Now desperate, Plaintiff began kicking the door again until a different unidentified C.O. arrived, who finally arranged for Plaintiff to get his asthma medicine. Id. ¶ 32.

The next day, Plaintiff did not receive a breakfast tray or his daily medication. Id. ¶ 33. When he asked why, he was told "because you assaulted an officer." Id. Later that day, once again experiencing shortness of breath, Plaintiff again had to ask multiple C.O.s before one of them helped him to get his asthma medicine. Id. ¶¶ 34–35.

### 3. *The Hospital Trip*

At 5:00 AM on the morning of April 25, 2016, Plaintiff woke up with "severe chest pains and difficulty breathing." Id. ¶ 36. He told the C.O. in front of his cell that he needed to see a doctor and was eventually taken to the infirmary. Id. ¶ 36–37. The doctor on duty examined Plaintiff and determined that he needed to go to the hospital. Id. ¶ 37. An ambulance took Plaintiff to Alice Hyde hospital, where x-rays revealed that he had multiple fractured ribs and a collapsed lung. Id. ¶ 38. Doctors there told Plaintiff that, if his injuries had not been treated, he might have died. Id. Plaintiff stayed in the hospital until April 27, 2016, when he was transferred to Upstate Correctional Facility ("Upstate"), just down the road from Bare Hill. Id. ¶¶ 40–41.

### 4. *The Cover-Up and Kingston's Involvement*

After the assault, on April 28, 2016, Plaintiff received five Tier III misbehavior report disciplinary tickets. Id. ¶ 42. Each of these tickets was based on false allegations and designed to cover up the assault on Plaintiff. Id.

The first ticket, written by Hanson, alleged that Plaintiff's personal identifying number ("PIN") was used to make calls during the period from April 15, 2016 to April 22, 2016, a period when Plaintiff was supposedly prohibited from using the phone. Id. ¶ 43. The ticket falsely stated that Kearney had told Plaintiff he could not use the phones during this period. Id. But Kearney had never given Plaintiff such an order, nor had Plaintiff used the phone during this period. Id. ¶ 44. In fact, this ticket was concocted to justify Plaintiff's April 23 transfer to the SHU, and Kearney made false statements to supply the factual basis for the ticket. Id. ¶¶ 46–47. "Though the ticket alleged that Lewis violated a direct order from Kearney not to use the phone on April 22, 2016, the ticket was not written until the day after the SHU transfer—April 23, 2016—and not until 3:05 PM, just before other misbehavior tickets were written." Id. ¶ 45. At a subsequent disciplinary hearing related to the ticket, the hearing officer found Plaintiff not guilty and dismissed the ticket. Id. ¶¶ 48, 51.

In addition to this first ticket, on April 23, 2016, other C.O.s filed four other fabricated tickets against Plaintiff to provide a false justification for his injuries. Id. ¶¶ 52–57.

Kingston was, in part, responsible for the cover-up. Id. ¶¶ 49–50. First, "[h]ad Kingston . . . performed any sort of investigation into whether [Plaintiff] had used the telephone . . . , [he] would have discovered that another inmate had used [Plaintiff's] PIN to call [a] number not associated with [Plaintiff] during the time period described in th[is] . . . ticket." Id. ¶ 49. Kingston should have done this given the suspicious timing of this ticket. Id.

Additionally, "Kingston was also involved in the issuing of false misbehavior tickets and made false statements to cover up the assault on [Plaintiff]." Id. ¶ 50.

### 5. Yelich's Involvement

Yelich's "gross negligence led to the assault on [Plaintiff]." Id. ¶ 70. First, Yelich "failed to take action to appropriately supervise Hanson, who Yelich knew or should have known had previously been involved in at least one other serious assault of an inmate[,] in 2015." Id. ¶ 71. Despite Hanson's misconduct, he "became a sergeant and was hired at Bare Hill." Id. ¶ 72. Then, in the assault on Plaintiff, "numerous . . . policies and procedures were violated." Id. ¶ 73. "Had Yelich been properly supervising staff at Bare Hill . . . , these events would not have transpired." Id. ¶ 74.

Additionally, "under Yelich's supervision, Bare Hill does not use any means of video surveillance in the entire facility, including the SHU." Id. ¶ 75. Thus, Yelich's "grossly negligent supervision allowed, and even encouraged, misconduct . . . as [Bare Hill staff] knew that they could act with impunity and cover up their behavior by breaking procedure and there would be no repercussions." Id. ¶ 76.[2]

## C. Plaintiff's Claims

Based on the above facts, Plaintiff asserts the following claims against each defendant: (1) excessive force in violation of the Fourth, Eighth, and Fourteenth Amendments, Am. Compl. ¶¶ 77–85; (2) deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment, id. ¶¶ 86–95; and (3) retaliation against Plaintiff for filing the Cowan Lawsuit in violation of the First and Fourteenth Amendments, id. ¶¶ 96–104. Plaintiff sues

---

[2] The Amended Complaint contains a more complete statement of Plaintiff's allegations. Am. Compl.

Yelich in both his individual and official capacities, and all other defendants in their individual capacities only. Id. ¶ 1. He seeks compensatory and punitive damages. Id. ¶ 105.

## III.   LEGAL STANDARDS

### A.  12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "Where, as here, the case is at the pleading stage and no evidentiary hearings have been held, . . . we must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." Conyers v. Rossides, 558 F.3d 137, 143 (2d Cir. 2009) (internal alterations, citations, and quotation marks omitted). The "[p]laintiff bears the burden of establishing the Court's subject matter jurisdiction by a preponderance of the evidence." Sprole v. Underwood, No. 18-CV-1185, 2019 WL 4736241, at *4 (N.D.N.Y. Sept. 27, 2019) (Kahn, J.).

### B.  12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Id. at 678 (citing Twombly, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Put another way, a claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].'" Pare v. Valet Park of Am.,

Inc., No. 19-CV-206, 2020 WL 495038, at *4 (N.D.N.Y. Jan. 30, 2020) (Kahn, J.) (alterations in original) (quoting Twombly, 550 U.S. at 556). "In assessing whether this standard has been met, courts 'must accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party[] . . . .'" Charles Ramsey Co., Inc. v. Fabtech-NY LLC, No. 18-CV-546, 2020 WL 352614, at *9 (N.D.N.Y. Jan. 21, 2020) (Kahn, J.) (alteration in original) (quoting In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007)).

## IV. DISCUSSION

Plaintiff brings his claims under 42 U.S.C. § 1983. "[Section] 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). Section 1983 does not create any substantive rights; instead it provides litigants a procedure to redress the deprivation of rights established elsewhere. Doe v. Patrick, No. 17-CV-846, 2020 WL 529840, at *7 (N.D.N.Y. Feb. 3, 2020) (Kahn, J.) (citing Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004)).

Bearing these principles in mind, the Court considers in turn: (A) the claims against Yelich in his official capacity; (B) the excessive force claims; (C) the medical indifference claims; (D) the retaliation claims; (E) whether to grant Plaintiff leave to amend.[3]

---

[3] Moving Defendants also argue that, "to the extent . . . Plaintiff purports to assert a conspiracy claim, that claim must be dismissed . . . ." Mem. at 12; Reply at 5. It does not appear to the Court that Plaintiff has alleged a conspiracy claim, see generally Am. Compl., and, indeed, Plaintiff makes no attempt to defend such a claim in his Opposition, see generally Opp'n. However, to the extent Plaintiff may have asserted such a claim, the Court deems that claim abandoned, and therefore dismisses it. See Holmes v. Cty. of Montgomery, No. 19-CV-617, 2020 WL 1188026, at *4 (N.D.N.Y. Mar. 12, 2020) (Kahn, J.) ("[A]t the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.") (citing Felix v. New York State Dep't of Corr. & Cmty. Supervision, No. 16-CV-7978, 2018 WL 3542859, at *6 (S.D.N.Y. July 23, 2018)).

**A. Claims Against Yelich in His Official Capacity**

Moving Defendants move under Rule 12(b)(1) to dismiss all claims against Yelich in his official capacity. Mem. at 13. They argue that, because Plaintiff seeks only monetary damages, the official capacity claims against Yelich are barred by the Eleventh Amendment. Id. (citing Ying Jing Gan v. City of New York, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.")). Plaintiff does not dispute this argument, see Opp'n at 7 n.1, and therefore appears to abandon these claims, see Holmes, 2020 WL 1188026, at *4. For this reason, and because amendment could not cure these claims, the Court dismisses with prejudice the official capacity claims against Yelich. See id. (dismissing abandoned claims); Animashaun v. Fischer, No. 19-CV-820, 2020 WL 374578, at *7 (N.D.N.Y. Jan. 23, 2020) (Kahn, J.) (dismissing with prejudice claims barred by the Eleventh Amendment).

**B. Excessive Force Claims**

The Court addresses first Plaintiff's excessive force claims brought under the Eighth Amendment, then his claims under the Fourth and Fourteenth Amendments.

*1. Eighth Amendment*

Moving Defendants do not contest that certain Bare Hill C.O.s "were involved in a use of force incident against Plaintiff on April 23, 2016," Mem. at 6, nor even Plaintiff's allegations that this "use of force" was excessive and violated his Eighth Amendment rights, see generally Mem. Instead, they argue that they were not personally involved incident and, therefore, cannot be held liable for any alleged Eighth Amendment violation. Id. at 4–7. With respect to Kearney and Kingston, the Court disagrees. However, with respect to Yelich, the Court finds that

Plaintiff's allegations have not satisfied the personal involvement requirement. To explain these decisions, the Court first addresses whether Plaintiff has stated an underlying excessive force claim, then examines whether Moving Defendants were personally involved in the events giving rise to that claim.

### a. Underlying Excessive Force Claim

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. An excessive force claim brought under this Amendment has both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). "The objective element is 'responsive to contemporary standards of decency' and requires a showing 'that the injury actually inflicted [is] sufficiently serious to warrant Eighth Amendment protection.'" Bennett v. Fletcher, No. 17-CV-849, 2020 WL 872491, at *8 (N.D.N.Y. Jan. 16, 2020) (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)), report and recommendation adopted sub nom. Bennett v. Jiguere, No. 17-CV-849, 2020 WL 871156 (N.D.N.Y. Feb. 21, 2020). The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (internal quotation marks and citations omitted). Thus, the key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically [to] cause[] harm." Hudson, 503 U.S. at 7 (internal quotation marks and citations omitted).

The Amended Complaint clearly states a claim for excessive force. It alleges that several C.O.s savagely and without justification attacked Plaintiff. Am Compl. ¶¶ 18–26. It alleges that, while they beat him, these C.O.s yelled racial epithets at Plaintiff. Id. ¶¶ 20, 23. And it alleges that Plaintiff was so badly hurt as a result of this beating, doctors told him "the injuries could

have been fatal." Id. ¶ 38. These allegations amply satisfy both the objective and subjective requirements of an Eighth Amendment excessive force claim. See, e.g., Rivera v. Goord, 119 F. Supp. 2d 327, 342 (S.D.N.Y. 2000) (denying motion to dismiss where the plaintiff alleged that C.O. defendants attacked him and beat him without provocation). Therefore, the Court now turns to whether Plaintiff has plausibly alleged that Moving Defendants were personally involved in this constitutional violation.

### b.  Personal Involvement

To be liable under § 1983, a defendant must be "personally involved" in the alleged constitutional violation. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). Indeed, a "§ 1983 plaintiff must show a 'tangible connection' between the acts of the defendant and the plaintiff's injuries.'" Sheffer v. Fleury, No. 18-CV-1180, 2019 WL 4463672, at *9 (N.D.N.Y. Sept. 18, 2019) (Kahn, J.) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)).

In particular, where a plaintiff brings claim against a supervisory official, that "official[] may not be held liable merely because they held a position of authority." Amaker v. Boyd, No. 19-CV-1253, 2020 WL 210317, at *12 (N.D.N.Y. Jan. 14, 2020) (Kahn, J.) (citing Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Iqbal, 556 U.S. at 676 ("[V]icarious liability is inapplicable to . . . § 1983 suits.")). Instead:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the

> rights of inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).[4] "Once a plaintiff properly alleges that a

defendant was personally involved in a constitutional deprivation, [she or he] 'must also

establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional

deprivation.'" Harrell v. New York State Dep't of Corr. & Cmty. Supervision, No. 15-CV-7065,

2019 WL 3821229, at *7 (S.D.N.Y. Aug. 14, 2019) (quoting Raspardo v. Carlone, 770 F.3d 97,

116 (2d Cir. 2014)).

Bearing these principles in mind, the Court first addresses whether Kearney and Kingston

were personally involved in the use of excessive force against Plaintiff, then examines Yelich's

personal involvement.

### i. Kearney and Kingston

Moving Defendants argue that "Plaintiff sets forth no facts supporting a reasonable

inference that . . . Kearney was involved in the alleged use of force," or that "Kingston failed to

properly supervise the other defendants [or] was actively involved in a violation of Plaintiff's

rights. Mem. at 6. Instead, according to Moving Defendants, "Plaintiff merely alleges that . . .

Kearney made a false statement in a misbehavior report" and "Kingston failed to investigate

---

[4] The Court notes here that the Second Circuit has not yet addressed how Iqbal affected Colon's standards for establishing supervisory liability. See Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) (noting that Iqbal may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of Iqbal on Colon); Hogan v. Fischer, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (expressing "no view on the extent to which [Iqbal] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations"). However, for the purposes of resolving this Motion to Dismiss, the Court assumes that all five branches of the Colon tree are alive and well. See, e.g., Mattison v. Johnson, No. 17-CV-1198, 2019 WL 1493188, at *4 n.4 (N.D.N.Y. Apr. 3, 2019) (assuming that "all five categories under Colon remain valid" for the purposes of resolving the defendants' 12(b)(6) motion).

Plaintiff's situation." Id. These allegations, say Moving Defendants, fail to "support an inference of personal involvement" or "support a constitutional claim." Id. The Court disagrees.

Prison officials who participate in preparing false misbehavior reports to cover up incidents of excessive force by other officials have been found personally involved in the underlying unconstitutional activity. See, e.g., Edwards v. Annucci, No. 17-CV-5018, 2019 WL 1284295, at *7 (S.D.N.Y. Mar. 20, 2019) (denying the defendants' 12(b)(6) motion and finding that they were personally involved in an excessive force incident committed by other prison guards because the defendants filed false reports in an effort to cover up the incident); Gillard v. Rovelli, No. 09-CV-860, 2010 WL 4905240, at *13 (N.D.N.Y. Sept. 29, 2010) ("The complaint alleges that Defendant Kelly participated in writing false misbehavior reports to cover up the excessive force incident. This allegation is potentially sufficient to state a claim against Defendant Kelly."), report and recommendation adopted by No. 09-CV-860, 2010 WL 4945770 (N.D.N.Y. Nov. 24, 2010). These are exactly the sort of allegations Plaintiff brings here.

Plaintiff asserts that "Kearney made false statements to supply the factual basis" for the ticket that Hanson fabricated to cover up the assault. Am. Compl. ¶ 46. Similarly, Plaintiff alleges that "Kingston himself was involved in issuing . . . false misbehavior tickets and made false statements to cover up the assault on [Plaintiff]." Opp'n at 14 (citing Am. Compl. ¶ 50). These allegations are sufficient to plausibly allege Kearney and Kingston's personal involvement in the assault on Plaintiff. See Randle v. Alexander, 960 F. Supp. 2d 457, 478 (S.D.N.Y. 2013) (denying motion to dismiss on personal involvement grounds where the plaintiff alleged that a prison guard-defendant "participated directly in the [underlying] conduct by filing a false report to his supervisors in order to cover up" constitutional violations by other guards); see also Edwards, 2019 WL 1284295, at *7 (denying motion to dismiss where the plaintiff alleged that a

defendant "wrote and submitted a memorandum in response to plaintiff's grievance in which [the defendant] falsely reported that a witness to the assault did not see anything[]" and "lied that he sp[oke] with all named staff" sufficient to state a claim against that defendant).

Moving protest that "Plaintiff's allegations that . . . Kearney[] [and] Kingston . . . failed to investigate Plaintiff's situation and engaged in a "cover up" subsequent to the alleged use of force fail to plausibly allege their personal involvement in a violation of Plaintiff's Eighth Amendment rights." Reply at 2. The Court is unconvinced. First, whether a plaintiff has a right to any investigation and whether a defendant who sabotages an investigation into a constitutional violation is personally involved in that underlying violation are analytically distinct questions. Next, the cases Moving Defendants cite in support of their argument that an official who covers up a constitutional violation is not personally involved in that violation are inapposite. See Reply at 2 (citing McCloud v. Prack, 55 F. Supp. 3d 478 (W.D.N.Y. 2014); Banks v. Annucci, 48 F. Supp. 3d 394 (N.D.N.Y. 2014); Reeder v. Hogan, No. 09-CV-520, 2012 WL 4107822 (N.D.N.Y. July 11, 2012), report and recommendation adopted by No. 09-CV-520, 2012 WL 4106740 (N.D.N.Y. Sept. 19, 2012)). These cases primarily provide support for Moving Defendants' contention that an inmate has no right to an investigation of alleged wrongful conduct. See McCloud, 55 F. Supp. 3d at 481 (W.D.N.Y. 2014) ("The law is clear, however, that inmates do not enjoy a constitutional right to an investigation of any kind by government officials.") (internal quotation marks omitted); Banks, 48 F. Supp. 3d at 414 (same); Reeder, 2012 WL 4107822, at *6 ("The failure of a supervisory official to investigate a letter of protest written by an inmate is insufficient to establish personal involvement [in the protested conduct]."). Only one of these cases, McCloud, appears to address the question of whether a "cover up" by officials can support a constitutional violation, but the Court does not find it persuasive here. See

McCloud, 55 F. Supp. 3d at 481 ("Plaintiff's allegations that Olles deliberately conducted an inadequate investigation for the purpose of covering up Griffin's alleged misconduct . . . [is] insufficient to make out a § 1983 claim against [him]."). McCloud discusses whether an alleged "cover up" or inadequate investigation is itself a constitutional violation actionable under § 1983. See id. at 481–82 (discussing whether allegations of a cover-up can support a valid § 1983 claim"). But it says nothing about whether or not a defendant may be personally involved in a constitutional violation separate from the cover-up—such as the use of excessive force—when that defendant covers up evidence regarding the violation. See generally id. Therefore, neither McCloud nor the other cases cited by Moving Defendants can displace the weight of authority cited by Plaintiff in support of the proposition that falsifying misbehavior reports to cover up a constitutional tort suffices to establish the falsifying defendants' personal involvement in that tort.

For these reasons, the Court finds that Plaintiff has plausibly alleged Kearney and Kingston's personal involvement in the excessive force incident. Therefore, the Court denies the Motion to Dismiss on this issue.

### ii. Yelich

Moving Defendants also argue that Plaintiff has insufficiently alleged Yelich's personal involvement in any constitutional deprivations. Mem. at 6–7. Here, the Court agrees.

At the outset, the Court thinks it worth quoting the sum total of the allegations against Yelich:

> **Defendant Yelich Was Grossly Negligent in Supervising Bare Hill**
> 70. Defendant Yelich is specifically charged with supervising Bare Hill, ensuring that the facility is safe for inmates, and making hiring decisions. Yet Yelich's gross negligence led to the assault on Lewis.
> 71. Among other things, Yelich failed to take action to appropriately supervise Hanson, who Yelich knew or should have known had previously

been involved in at least one other serious assault of an inmate in 2015, the year before Lewis was assaulted.

72. Despite Hanson's very serious misconduct, Hanson became a Sergeant and was hired at Bare Hill Correctional Facility as a Sergeant.

73. Numerous other policies and procedures were violated and/or disregarded in connection with the assault on Lewis.

74. Had Yelich been properly supervising staff at Bare Hill to ensure compliance, these events would not have transpired.

75. Further, under Yelich's supervision, Bare Hill does not use any means of video surveillance in the entire facility, including the SHU, even though this is where inmates with disciplinary issues or who pose a threat to themselves or others are housed.

76. This grossly negligent supervision allowed, and even encouraged, misconduct on the part of Bare Hill staff, as they knew that they could act with impunity and cover up their behavior by breaking procedure and there would be no repercussions.

Am. Compl. ¶¶ 70–76. In addition to these allegations in the body of the Amended Complaint, under each cause of action the Amended Complaint also states that "Supervisor Defendants are liable as supervisors for the behavior of the other defendants, due to their gross negligence in supervising the staff at Bare Hill." Id. ¶¶ 84, 94, 103.

Based on these allegations, Plaintiff seeks to establish Yelich's personal involvement in his subordinates' alleged misconduct through the fourth Colon prong: gross negligence. See Colon, 58 F.3d at 873 ("The personal involvement of a supervisory defendant may be shown by evidence that: . . . (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts . . . ."). A supervisor is grossly negligent when she or he "knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [the] [p]laintiff." Bivona v. McLean, No. 19-CV-303, 2019 WL 2250553, at *4 (N.D.N.Y. May 24, 2019); see also Nelson v. City of New York, No. 18-CV-4636, 2019 WL 3779420, at *15 (S.D.N.Y. Aug. 9, 2019) ("[G]ross negligence denotes a higher degree of

culpability than mere negligence."). Plaintiff solely relies upon the allegation that Hanson was involved in a prior assault on an inmate to establish Yelich's grossly negligent supervision.[5]

Although the Amended Complaint alleges that "Yelich knew or should have known" that Hanson had "previously been involved in at least one other serious assault of an inmate in 2015," Am. Compl. ¶ 71, this "naked assertion[,] devoid of . . . factual enhancement," Iqbal, 556 U.S. at 678, is insufficient to plausibly establish Yelich's knowledge of a high degree of risk that his subordinates would engage in misconduct. Plaintiff asserts that, after the 2015 assault, "Hanson became a Sergeant and was hired at Bare Hill," Am. Compl. ¶ 72, but he has failed to provide additional allegations confirming that it was Yelich who promoted Hanson or Yelich who hired him, see id. Moreover, the Amended Complaint has not provided information about the location of Hanson's 2015 assault, whether Hanson worked at Bare Hill at the time of the assault, or whether Yelich worked there either.[6] See id. Finally, the Amended Complaint lacks details about Hanson's prior assault, such as whether lawsuits or grievances were filed, or whether Hanson was disciplined as a result, see Am. Compl., details that would help to put Yelich on notice.

---

[5] There are no other allegations in the Amended Complaint about any other prior misconduct by any other named defendant or Bare Hill staff member more generally. See generally Am. Compl. Since there are no other allegations of conduct that would have put Yelich on notice of a "high degree of risk that his subordinates [other than Hanson] would behave inappropriately," Bivona, 2019 WL 2250553, at *4, there are, therefore, no "facts from which to infer [his] . . . gross negligence in preventing [those] subordinates from causing the constitutional violations alleged," Alexander v. Racette, No. 17-CV-309, 2019 WL 121670, at *3 (N.D.N.Y. Jan. 7, 2019); see also Rahman v. Fischer, No. 08-CV-4368, 2010 WL 1063835, at *5 (S.D.N.Y. Mar. 22, 2010) ("Without alleging that [the supervisor defendant] was personally on notice of a condition that could reasonably lead to an assault of an inmate . . . , [plaintiff] has failed to state a claim against [the supervisor]."). Therefore, Yelich's gross negligence must be inferred from his knowledge of Hanson's alleged past misconduct alone.

[6] In fact, the Amended Complaint suggests that Hanson's prior assault occurred someplace other than at Bare Hill, as it alleges that, "[d]espite [this assault], Hanson . . . was hired at Bare Hill . . . ." Am Compl. ¶ 72.

Without such allegations, the Amended Complaint contains insufficient "factual content to nudg[e] [Plaintiff's claim against Yelich] across the line from conceivable to plausible." Iqbal, 556 U.S. at 683 (internal quotation marks omitted); see also Rucano v. Koenigsmann, No. 12-CV-35, 2014 WL 1292281, at *14 (N.D.N.Y. Mar. 31, 2014) (dismissing claim where plaintiff "fail[ed] to allege any facts from which it could plausibly be concluded that [the supervisory] Defendant . . . was, or should have been, aware of the allegedly deficient performance of his subordinates."); Nash v. McGinnis, 585 F. Supp. 2d 455, 460 (W.D.N.Y. 2008) ("Although plaintiff need not plead facts in great detail, the formulaic allegation that [the supervisory defendant] was aware of the alleged violations . . . without some factual allegations to explain the basis for that conclusion, is insufficient to render it plausible that [the supervisory defendant] was personally involved in the alleged constitutional deprivations.").

Moreover, even assuming that Plaintiff plausibly alleged Yelich's knowledge of Hanson's 2015 assault—and, therefore, Yelich's knowledge that Hanson posed a high risk of behaving improperly—Plaintiff has failed to establish that Yelich "either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk." Bennett v. Columbe, No. 16-CV-653, 2017 WL 6049238, at *4 n.5 (N.D.N.Y. Oct. 17, 2017), report and recommendation adopted by No. 16-CV-653, 2017 WL 6062904 (N.D.N.Y. Dec. 6, 2017); see also Poe v. Leonard, 282 F.3d 123, 140 n.14 (2d Cir. 2002) (discussing supervisory liability and stating "[w]e have often equated gross negligence with recklessness . . . ."). Most of Plaintiff's allegations on this point are vague and conclusory. See Am. Compl. ¶¶ 70 ("Defendant Yelich is specifically charged with supervising Bare Hill . . . Yet Yelich's gross negligence led to the assault on [Plaintiff]."); 71 ("Among other things, Yelich failed to take action to appropriately supervise Hanson."); 74 ("Had Yelich been properly

supervising staff at Bare Hill to ensure compliance, [the assault on Plaintiff] would not have transpired."); 76 ("[Yelich's] grossly negligent supervision allowed, and even encouraged, misconduct on the part of Bare Hill staff . . . ."). These allegations say little to nothing about what exactly Yelich did or did not do to supervise Hanson or any other Bare Hill staff member. Nor does Plaintiff elaborate in his Opposition, asserting that "Yelich should have been supervising the staff at Bare Hill . . . , but he was not." Opp'n at 11. Unadorned claims such as these are insufficient to plausibly allege Yelich's personal involvement in his subordinates' misconduct. See Villafane v. Sposato, No. 16-CV-3674, 2017 WL 4179855, at *15 (E.D.N.Y. Aug. 22, 2017) (dismissing the plaintiff's claim because, in part, he "fail[ed] to set forth any detail regarding how [the supervisory] Defendant . . . failed to supervise his subordinates or which subordinates he failed to supervise"), report and recommendation adopted by No. 16-CV-3674, 2017 WL 4157220 (E.D.N.Y. Sept. 15, 2017); McRae v. Gentile, No. 14-CV-783, 2015 WL 7292875, at *5 (N.D.N.Y. Oct. 20, 2015) ("[V]ague and conclusory allegations that a supervisor failed to properly monitor the actions of subordinate employees do not suffice to establish the requisite personal involvement and support a finding of liability." (citing Pettus v. Morgenthau, 554 F.3d 293, 300 (2d Cir. 2009))); Styles v. Goord, 431 F. App'x 31, 33 (2d Cir. 2011) (no personal involvement where plaintiff "did not allege . . . any facts concerning [supervisor defendants'] particular conduct in supervising their subordinates").

Once the Court disregards the conclusory allegations listed above, Plaintiff's sole remaining allegation to support his claim that Yelich recklessly disregarded a substantial risk to his safety is his assertion that Yelich failed to install video surveillance equipment at Bare Hill.[7]

---

[7] Plaintiff cites to several cases in which claims against a supervisory defendant survived a motion to dismiss, but which did not base that decision on the supervisory defendant's failure to install video surveillance equipment in prison. See Mem. at 10–11 (citing Green v. Greene,

See Am. Compl. ¶ 75. However, this allegation alone does not plausibly establish Yelich's gross negligence since Plaintiff has failed to allege that (1) Yelich had the authority to unilaterally institute a video surveillance system at Bare Hill, (2) Yelich had sufficient control over, or resources in, the Bare Hill budget to implement such a system, or (3) such a system could have been designed, approved, and installed between Hanson's 2015 misconduct and Plaintiff's April 2016 assault. See Am. Compl. These deficiencies mean that Plaintiff has failed to sufficiently allege that it was Yelich's action (or inaction), and not someone else's, that prevented the installation of surveillance cameras. See Tangreti v. Semple, No. 17-CV-1420, 2019 WL 4958053, at *16 (D. Conn. Oct. 8, 2019) (finding that a supervisor's delay in installing a video surveillance system in a prison did not make the supervisor personally involved in an assault on an inmate where the plaintiff could not establish that the supervisor was solely responsible for the delay); see also Harrell, 2019 WL 3821229, at *7 (noting that a plaintiff must "establish that the supervisor's actions were the proximate cause of the . . . constitutional deprivation").

And, even if Yelich were responsible for the lack of security cameras at Bare Hill, Yelich's conduct would not necessarily demonstrate he was personally involved in the alleged deprivations of Plaintiff's constitutional rights. See Zielinski v. Annucci, No. 17-CV-1042, 2019 WL 2870337, at *9 (N.D.N.Y. Mar. 19, 2019) (dismissing claims based on prison superintendents' "refusal to use surveillance cameras and body cameras" for lack of personal involvement), report and recommendation adopted by No. 17-CV-1042, 2019 WL 2869608 (N.D.N.Y. July 3, 2019); Towner v. Lape, No. 08-CV-47, 2009 WL 81221, at *2–3 (N.D.N.Y.

No. 07-CV-351, 2009 WL 5874308, at *21 (N.D.N.Y. Mar. 30, 2009), report and recommendation adopted by No. 07-CV-351, 2010 WL 455456 (N.D.N.Y. Feb. 2, 2010); Felix-Torres v. Graham, 521 F. Supp. 2d 157, 163 (N.D.N.Y. 2007) (Kahn, J.)). Because Plaintiff's claims against Yelich rely so heavily on this allegation, these cases are of little help to Plaintiff.

Jan. 9, 2009) (dismissing claim against prison superintendent for lack of personal involvement where plaintiff alleged that "defendants failed to protect him by installing fully functional security cameras"); see also Bowman v. Lawrence Cty. Comm'n, No. 08-CV-602, 2009 WL 10688468, at *5 (N.D. Ala. May 4, 2009) (granting county's motion to dismiss where plaintiff alleged that county was deliberately indifferent to high risk of inmate suicide by failing to install video cameras in prison). Plaintiff, tellingly, has cited no cases to the contrary, in which a supervisory defendant's gross negligence was established by allegations that the supervisor failed to install surveillance equipment. See Mem. at 10–12.[8]

Admittedly, several other courts have allowed claims to proceed in which a plaintiff alleges that a jailer-defendant failed to implement proper video surveillance. See Williams v. Connell, No. 17-CV-750, 2018 WL 3468213, at *5 (N.D.N.Y. July 18, 2018) (denying supervisors' motion to dismiss where plaintiff alleged numerous steps supervisors should have taken to protect inmates in addition to "use of security cameras"); Henderson v. Glanz, No. 12-CV-68, 2012 WL 5931546, at *4 (N.D. Okla. Nov. 27, 2012) (denying motion to dismiss where plaintiff alleged that the defendant sheriff had a "custom of maintaining inadequate supervision .

---

[8] The only cases Plaintiff cites that are arguably related to his video surveillance allegations are Brown v. Artus, 647 F. Supp. 2d 190 (N.D.N.Y. 2009) (Kahn, J.) and Reeder v. Annucci, No. 16-CV-1161, 2018 WL 3121630, at *5 (N.D.N.Y. Jan. 19, 2018), report and recommendation adopted by No. 16-CV-1161, 2018 WL 1444220 (N.D.N.Y. Mar. 22, 2018). See Mem. at 10–11 (citing Brown, 647 F. Supp. 2d at 202; Reeder, 2018 WL 3121630, at *5). However, in Brown—decided on summary judgment—the Court found that evidence of a supervisor defendant expressing interest in having cameras installed demonstrated the supervisor's knowledge of a risk to inmates. See 647 F. Supp. 2d at 202. The Brown court did not address, however, whether any failure to install cameras helped demonstrate that supervisor's gross negligence in supervising his subordinates. See id. Likewise, in Reeder, the court found allegations that a supervisory defendant had "refused to watch available video evidence of . . . alleged assaults" plausibly stated the supervisor's personal involvement. See 2018 WL 3121630, at *5. But, whether a supervisor reviews existing video evidence is a wholly separate issue from whether a supervisor institutes an entirely new video surveillance system. Thus, both cases are inapposite and of little help to Plaintiff.

. . with respect to known areas that are not monitored via surveillance equipment, or 'blind spots,' within the [j]ail" and that the sheriff "was aware of prior sexual assaults and sexual encounters . . . in these 'blind spots'"); cf. Bowen v. City of Manchester, 966 F.2d 13, 21 (1st Cir. 1992) (granting summary judgment to supervisory defendant because plaintiff's assertion that defendant had not "install[ed] more sophisticated monitoring equipment in the lockup" did not establish deliberate indifference, but noting as well that the "evidence establishes that Chief King was perhaps very negligent"). But these cases do not alter the Court's conclusion. In each, more detailed allegations describe misconduct beyond a mere failure to install cameras, and the supervisors had more notice than a single prior incident involving one guard who may or may not have committed misconduct at the facility in question. Without such allegations to more securely "nudge[] [his] claims across the line from conceivable to plausible," Twombly, 550 U.S. at 570, the Court is reluctant to intrude into an area of prison administration more traditionally reserved to other actors, see Turner v. Safley, 482 U.S. 78, 85 (1987) ("Prison administration is . . . a task that has been committed to the responsibility of [the legislative and executive] branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities."). After all, "[i]f Plaintiff's argument were correct, it would require surveillance cameras to be installed in all areas at every prison where inmates" are at a high risk of suffering unconstitutional misconduct. Peterson v. Mickles, No. 17-CV-1702, 2020 WL 214749, at *10 (D. Or. Jan. 14, 2020). "[T]hat decision [might] be good as a matter of policy," id., but this Court is unlikely to be best positioned to make it, see Turner, 482 U.S. at 85; Jones v. N. Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 126 (1977) ("Because the realities of running a penal institution are complex and difficult, we have . . .

recognized the wide-ranging deference to be accorded the decisions of prison administrators.").
Therefore, the Court finds that Plaintiff has not plausibly alleged that Yelich was grossly
negligent by failing to install video surveillance at Bare Hill and grants Yelich's Motion to
Dismiss.

### 2. *Fourth and Fourteenth Amendments*

Preliminarily, Moving Defendants argue that any excessive force claims brought under
the Fourth and Fourteenth Amendments must be dismissed because, during the alleged assault
and its aftermath, Plaintiff was a convicted prisoner. Mem. at 3. The Court agrees.

Starting with the Fourth Amendment claims, "[w]hile claims of excessive force in the
course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under
the Fourth Amendment, post-conviction excessive force claims, such as [Plaintiff's] are properly
considered under the Eighth Amendment." Bonilla v. Jaronczyk, 354 F. App'x 579, 581 (2d Cir.
2009) (internal citations and quotation mark omitted). When a post-conviction prison inmate
brings an excessive force claim under both the Fourth and Eighth Amendments, courts dismiss
the Fourth Amendment claim as duplicative. See Lang v. Zurek, No. 18-CV-506, 2018 WL
6069468, at *4 (N.D.N.Y. Oct. 17, 2018) (dismissing Fourth Amendment claim and analyzing
excessive force claim under the Eighth Amendment), report and recommendation adopted by No.
18-CV-506, 2018 WL 6068416 (N.D.N.Y. Nov. 20, 2018). Though the Amended Complaint
does not state explicitly that Plaintiff was imprisoned at Bare Hill after a conviction, publicly
available records indicate that Plaintiff entered the DOCCS prison system on November 8, 2011
and was released from the system on November 16, 2017. See N.Y.S. DOCCS Inmate
Information website, *available at* http://nysdoccslookup.doccs.ny.gov (information obtained for
DIN# 11-A-4997); Am. Compl. ¶ 11, n.1; see also Fine v. ESPN, Inc., 11 F. Supp. 3d 209, 223

(N.D.N.Y. 2014) ("In deciding a motion to dismiss, a court may take judicial notice of public records . . . ."). Hence, the Court infers that Plaintiff was a post-conviction prisoner at all relevant times. Additionally, Plaintiff did not object to Defendant's suggestion that Plaintiff was a post-conviction inmate, or to Defendant's argument that Plaintiff's Fourth Amendment excessive force claims must be dismissed. See Opp'n. Therefore, the Court dismisses these claims.

The Court likewise dismisses the Fourteenth Amendment excessive force claims, as they are "subsumed" by Plaintiff's Eighth Amendment claims. See Rodriguez v. Morton, No. 04-CV-3787, 2009 WL 414033, at *9 (S.D.N.Y. Feb. 13, 2009) ("Where, as here, a plaintiff's Eighth Amendment and 14th Amendment . . . claims overlap, the due process claim will be subsumed by the Eighth Amendment claim as the Eighth Amendment offers greater protection to prisoners.") (internal citations and quotation marks omitted). Therefore, the Court dismisses these claims as well. See Felix-Torres, 521 F. Supp. 2d at 164 (dismissing Fourteenth Amendment claims that were subsumed by Eighth Amendment claims based on same factual allegations).

### C. Medical Indifference Claims

Moving Defendants ask the Court to dismiss Plaintiff's medical indifference claims against them, arguing that "Plaintiff sets forth no facts supporting a reasonable inference that Defendants Kearney, Kingston, or Yelich was personally involved in a deprivation of Plaintiff's medical care." Mem. at 8. In his Opposition, Plaintiff only contests the Motion to Dismiss as to Yelich. See Opp'n at 16–17. This indicates that Plaintiff has abandoned his medical indifference claims against Kearney and Kingston. See Holmes, 2020 WL 1188026, at *4 ("[A]t the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing

to address the defendant's arguments in support of dismissing that claim."). Therefore, the Court dismisses the medical indifference claims against these two defendants. See id. (dismissing abandoned claims).

The Court also dismisses the medical indifference claim against Yelich. As described above, the only allegation Plaintiff makes against Yelich specific to the medical indifference claim is that "Supervisor Defendants are liable as supervisors for the behavior of the other defendants, due to their gross negligence in supervising the staff at Bare Hill." Am. Compl. ¶ 94. Besides this, the sum of the allegations against Yelich are those quoted above in the section discussing Plaintiff's excessive force claim against Yelich. See Am. Compl. ¶¶ 70–76. Since there are no additional allegations, and since Plaintiff's arguments again rely heavily on his assertion that Yelich should have installed surveillance cameras at Bare Hill, see Opp'n at 16–17, the Court dismisses the medical indifference claim against Yelich for the same reasons it dismisses the excessive force claim: namely, Plaintiff has failed to plausibly allege that Yelich was grossly negligent in the supervision of his subordinates.

### D.  Retaliation Claims

Moving Defendants urge the Court to dismiss the retaliation claims against them, arguing that the Amended Complaint fails to plausibly allege that they took adverse action against Plaintiff or that any adverse action was motivated by Plaintiff's protected speech. Mem. at 9–13. The Court agrees as to Yelich, but disagrees as to Kearney and Kingston.

To state a claim for First Amendment retaliation, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Kampfer v. Argotsinger, No. 18-CV-7, 2020 WL 906274, at *9 (N.D.N.Y. Feb. 25,

2020) (Kahn, J.). With regard to the third element, the plaintiff must establish that "the protected conduct was a substantial or motivating factor" behind the retaliatory action. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996). In general, "[c]ourts properly approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted).

### 1. Kearney and Kingston

With regard to the first element, all parties appear to agree that the Cowan Lawsuit constitutes protected activity, and that pursuing the Cowan Lawsuit allegedly precipitated the retaliation. Mem. at 12; Opp'n at 18; Am. Compl. ¶ 24. Because "[t]here is no doubt that the filing of lawsuits . . . is constitutionally protected activity," Plaintiff has satisfied the first element of his retaliation claim. See Ford v. Martuscello, No. 14-CV-1566, 2016 WL 5322166, at *4 (N.D.N.Y. June 23, 2016) report and recommendation adopted by No. 14-CV-1566, 2016 WL 5256901 (N.D.N.Y. Sept. 22, 2016)); see also Colon, 58 F.3d at 872 ("[P]risoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right.").

As for the second element, Moving Defendants argue that "Plaintiff [has] fail[ed] to set forth any facts supporting a reasonable inference that . . . Kearney, Kingston, or Yelich took any adverse action against Plaintiff." Mem. at 11. However, as Plaintiff rightly observes, "the filing of false misbehavior reports with the purpose of retaliation constitutes adverse action for purposes of a retaliation claim." Opp'n at 18 (citing, inter alia, Gill v. Pidlypchak, 389 F.3d 379,

384 (2d Cir. 2004) (holding that the plaintiff had satisfied the adverse action element of a retaliation claim by alleging "the filing of false misbehavior reports against" him)); see also Burroughs v. Petrone, 138 F. Supp. 3d 182, 206 (N.D.N.Y. 2015) (declining to dismiss the plaintiff's claims against defendants who had "filed false misbehavior reports in retaliation for plaintiff's exercise of his constitutional rights"). Since the Amended Complaint alleges that both Kearney and Kingston participated in filing the false misbehavior reports against Plaintiff, Am. Compl. ¶¶ 46, 50, Plaintiff has satisfied the adverse action requirement as to these two defendants.

Moving to the third element, Kearney and Kingston argue that Plaintiff has failed to plausibly allege a causal connection between their alleged adverse actions and Plaintiff's pursuit of the Cowan Lawsuit. Mem. at 12. Moving Defendants first argue that "Plaintiff cannot plausibly claim that Kearney[] [or] Kingston[] . . . was motivated to retaliate against Plaintiff by a lawsuit Plaintiff filed against a different officer at a different prison." Id. (citing Hare v. Hayden, No. 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant."); Roseboro v. Gillespie, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (same)). However, as Plaintiff points out, courts in this Circuit have "declined to dismiss retaliation claims on the basis that the underlying protected activity was directed towards a third party." Opp'n at 18–19 (citing Funches v. Russo, No. 17-CV-1292, 2018 WL 6982087, at *5 (N.D.N.Y. Nov. 2, 2018) (declining to dismiss retaliation claims where protected activity was directed against third party), report and recommendation adopted as modified by No. 17-CV-1292, 2018 WL 6381058 (N.D.N.Y. Dec. 6, 2018) (Kahn, J.); Ford, 2016 WL 5322166, at *5 ("The fact that none of the grievances were alleged to have been filed against defendants King, Williams or

Cowan is not dispositive of whether plaintiff has stated a retaliation claim against them."). Therefore, this argument is unavailing.

Kearney and Kingston next argue that "the time gap between Plaintiff's filing of the [Cowan Lawsuit] in June 2015 and the alleged events at Bare Hill . . . in April 2016 is too long to support an inference of causation." Mem. at 12 (citing Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation.")) (other citation omitted); see also Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001) ("[A] plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse action.") (internal quotation marks and citation omitted). However, despite this suggestion by Moving Defendants that three months is the maximum time gap that can support and inference of causation, the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (six months not too long). Where, as here, the alleged adverse action occurred in response to ongoing litigation, see Opp'n at 19; Am. Compl. ¶ 24 (stating that the Cowan Lawsuit was "then pending" at the time Plaintiff was assaulted), there is adequate "temporal proximity" to find causation. See Cruz v. Lee, No. 14-CV-4870, 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016) (finding "close temporal proximity" where adverse action occurred during the pendency of the plaintiff's lawsuit); see also Lindner v. Int'l Business Machines Corp., No. 06-CV-4751, 2008 WL 2461934, at *7 (S.D.N.Y. June 18, 2008) (noting that "retaliation claims are rarely dismissed pursuant to Rule

12(b)(6) where the plaintiff has alleged a time period of less than one year between the protected activity and the alleged retaliatory conduct").

Thus, the Court finds that Plaintiff's plausible allegations satisfy the elements of a First Amendment retaliation claim against Kearney and Kingston. Before moving on, the Court notes here that, during Plaintiff's assault, Hanson told him that he was "get[ting] the special treatment because he filed a lawsuit against one of our brothers," namely Cowan. Am. Compl. ¶ 23. To the extent that officials at Bare Hill considered themselves part of some sort of "brotherhood" with C.O.s at other correctional facilities, "the filing of grievances [or lawsuits] against other members of the alleged Brotherhood" appears more likely to be "a substantial or motivating factor for the assault." See Ford, 2016 WL 5322166, at *5. Its conclusion so buttressed, the Court denies Kearney and Kingston's Motion to Dismiss the retaliation claim.

### 2. Yelich

As described above, Plaintiff's allegations satisfy the first element of a retaliation claim. However, Plaintiff's retaliation claim against Yelich fails on the second element because Plaintiff has failed to allege that Yelich took any adverse action against him. The closest Plaintiff comes to alleging an adverse action by Yelich is when he asserts that "[h]ad Kingston or *any other supervising officer* performed any sort of investigation . . . they would have discovered" that the misbehavior tickets filed against Plaintiff were false. Am. Compl. ¶ 49. But even assuming this allegation refers to Yelich, Plaintiff's claim fails because an "allegation that the defendant conducted an inadequate investigation of . . . plaintiff's complaint fail[s] to meet the adverse action requirement." Burroughs, 138 F. Supp. 3d at 207 (internal quotation marks omitted) (citing Islam v. Goord, 05-CV-7502, 2006 WL 2819651, at *5 (S.D.N.Y. Sept. 26, 2006); see also Matthews v. Barq, No. 18-CV-855, 2019 WL 1025828, at *8 (N.D.N.Y. Mar. 4,

2019) ("[P]laintiff's allegation that defendant Thoms failed to investigate his complaints, without more, does not satisfy the adverse action requirement."). Plaintiff points to no other allegation in the Amended Complaint that might satisfy the adverse action requirement as to Yelich. See Opp'n. Nor, for the reasons described above in the section on excessive force, is Yelich liable for any retaliatory acts committed by his subordinates through his alleged gross negligence. Therefore, the Court grants the Motion to Dismiss Plaintiff's retaliation claim against Yelich.

### E.  Leave to Amend

Moving Defendants ask the Court to dismiss the claims against them with prejudice. See Mem. at 1–3, 13. In contrast, Plaintiff asks for leave to replead any dismissed claims. Opp'n at 2. Moving Defendants object to Plaintiff's request, arguing that "Plaintiff has already amended the complaint once," and that "repleading would be futile" anyway. Reply at 6.

"The decision to grant or deny leave to amend . . . is within the trial court's discretion." Shi Ming Chen v. Hunan Manor Enter., Inc., No. 17-CV-802, 2020 WL 520854, at *1 (S.D.N.Y. Feb. 3, 2020). Here, the Court believes that Plaintiff's request for leave to amend is premature. See Koehler v. Metro. Transportation Auth., 214 F. Supp. 3d 171, 178 (E.D.N.Y. 2016) ("[A] bare request to amend a pleading contained in a brief, which does not also attach the proposed amended pleading, is improper under Fed. R. Civ. P. 15."). Neither party has provided more than the most cursory briefing on the issue, nor discussed the various "good reason[s]" for which a Court might deny leave. See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007) (listing reasons); see also Malin v. XL Capital, Ltd., 312 F. App'x 400, 402–03 (2d Cir. 2009) ("[W]e have not required district courts to provide[] detailed explanations when denying cursory or boilerplate requests for [requests to amend a complaint], made solely in a

memorandum in opposition to a motion to dismiss)." For this reason, the Court denies leave to amend at this time.

However, except for the claims against Yelich in his official capacity—which, as noted above, the Court dismisses with prejudice—the Court does not believe that Plaintiff's dismissed claims "suffer from fatal substantive defects" as Moving Defendants assert. See Reply at 6. Therefore, having denied Plaintiff's request for leave to amend, the Court also denies Moving Defendants' request for dismissal with prejudice. See Goode v. Manchester, No. 18-CV-116, 2019 WL 1385762, at *5 (N.D.N.Y. Mar. 27, 2019) ("[T]he court will dismiss [the plaintiff's] claims . . . without prejudice, given that better pleading could cure the problems with them.").

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Moving Defendants' Motion to Dismiss (Dkt. No. 79) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED**, that all claims against Yelich in his official capacity are **DISMISSED with prejudice**; and it is further

**ORDERED**, that the following claims are **DISMISSED without prejudice**: (1) all claims against Yelich in his individual capacity, (2) Plaintiff's medical indifference claims against Kearney and Kingston, and (3) Plaintiff's conspiracy claims, to the extent he has alleged any; and it is further

**ORDERED**, that the following claims may proceed: (1) Eighth Amendment excessive force claims against Kearney and Kingston, and (2) First Amendment retaliation claims against Kearney and Kingston; and it is further

**ORDERED**, that the Clerk shall **TERMINATE** Yelich as a defendant in this action; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:      April 09, 2020
              Albany, New York

Lawrence E. Kahn
Senior U.S. District Judge