UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

RAYMOND LEWIS,

                Plaintiff,

    -against-                               9:18-CV-0012 (LEK/DJS)

JASON HANSON, *et al.*,

                Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.  INTRODUCTION

On April 11, 2019, Raymond Lewis filed his amended complaint against several corrections officers employed by the New York State Department of Corrections and Community Supervision ("DOCCS") at Bare Hill Correctional Facility in Malone, New York ("Bare Hill"), at all times relevant to this matter: Jason Hanson, Joseph Sharpe, Craig Robideau, Zachary Peck, Scott Mere, Jason Kearney and John Kingston.[1] Dkt. No. 61 ("Amended Complaint"). Plaintiff's claims arise from circumstances surrounding a use of force incident that occurred at Bare Hill on April 23, 2016, and Plaintiff's subsequent requests for medical aid on April 24, 2016. See Am. Compl. at 4. Now before the Court are motions for summary judgment filed by Robideau, Peck, Mere, Kearney, and Kingston (collectively, "Defendants"). Dkt. Nos. 136 ("Robideau Motion"), 136-5 ("Robideau Memorandum"), 136-4 ("Robideau Statement of Material Facts" or "Robideau SMF"), 136-1 ("Roberts Declaration"), 136-2 ("Exhibits A-L"), 136-3 ("Robideau Declaration"); 137 ("Peck Motion"), 137-1 ("Peck Memorandum"), 137-2

_____

[1] The Amended Complaint also contained claims against Bruce Yelich, but all such claims were dismissed pursuant to the Court's order on the Motion to Dismiss filed by Kearney, Kingston, and Yelich. See Dkt. Nos. 79, 100.

("Peck Statement of Material Facts" or "Peck SMF"), 137-3 ("Soehnlein Declaration"); 138

("Mere Motion"), 138-2 ("Mere Memorandum"), 138-1 ("Mere SMF"), 138-3 ("Birchenough

Declaration"), 138-4 ("Mere Declaration"), Dkt. Nos 139; ("Kearney & Kingston Motion"), 139-

16 ("Kearney & Kingston Memorandum"), 139-17 ("Kearney & Kingston Statement of Material

Facts" or "Kearney & Kingston SMF"), 139-1 ("Kearney Declaration"), 139-2 ("Kingston

Declaration"), 139-3 ("Mitchell Declaration"), 139-4 ("Plaintiff's Deposition"), 139-5 ("Kearney

Deposition"), 139-6 ("Kingston Deposition").

Plaintiff has responded. Dkt. Nos. 149 ("Plaintiff's Response Memorandum"), 149-3

("Plaintiff's Response to Defendants' Statements of Material Facts and Statement of Material

Facts" or "Plaintiff's SMF")[2], 149-1 ("Plaintiff's Declaration"), 149-2 ("Noonan Declaration").

And all five defendants have replied. Dkt. Nos. 154-3 ("Robideau Reply Memorandum"), 154-2

("Robideau Reply SMF"), 154 ("Roberts Reply Declaration"); 152 ("Peck Reply

Memorandum"), 152-1 ("Peck Reply SMF"); 155 ("Mere Reply Memorandum"), 155-1 ("Mere

Reply SMF"); 151 ("Kearney & Kingston Reply Memorandum").

For the reasons set forth below, each of Defendants' motions for summary judgment is

granted in part and denied in part.

## II.   BACKGROUND

### A.  Factual Background

#### 1.  *Plaintiff's Alleged Phone Violation and Transfer to the SHU*

The following facts are not in dispute except where noted.

---

[2] Because Plaintiff has set forth his response to Defendants' statements of material facts in the
same document as his own statement of material facts, the Court will cite to the sections
responding to Defendants SMFs (pages 1–42) by their page number, but will cite to the sections
setting forth Plaintiff's own material facts (pages 43–54) by their paragraph designation in order
to most clearly designate which of Plaintiff's allegedly material facts are being referenced.

In April of 2016, all Defendants were employed as corrections officers at Bare Hill where Plaintiff was incarcerated. Robideau SMF ¶ 2; Mere SMF ¶ 2; Peck SMF ¶ 10; Kearney & Kingston SMF ¶¶ 12, 20; Pl.'s SMF ¶ 1. At this time, Plaintiff had a lawsuit pending against Officer Brian Cowan, who Plaintiff alleged had assaulted him while he was incarcerated at the nearby Franklin Correctional Facility. Pl.'s SMF ¶ 3.

On April 22, 2016, Plaintiff was on "cube confinement" and was restricted from using the telephones. Pl.'s SMF ¶ 8; Kearney & Kingston SMF ¶ 2. That day, Kearney was assigned to the E-1 dorm where Plaintiff resided. Kearney & Kingston SMF ¶ 14. An inmate approached Kearney, asked to use the phone, and provided Plaintiff's ID number. Id. ¶ 15–16. When Kearney saw the ID number belonged to an inmate with restricted phone privileges, he refused the inmate's request and instructed him to return to his cube. Id. ¶ 18. Kearney and Kingston assert that Plaintiff was the inmate who requested to use the phone, id., while Plaintiff insists he never approached Kearney or asked to make a phone call that day, Pl.'s SMF at 4.

The next day, April 23, 2016, Defendant Kingston was on duty as a Watch Commander. Id. ¶¶ 20, 24. Part of his responsibilities as Watch Commander were to check phone logs to see if inmates who had phone restrictions had been using them improperly. Id. at 21. That day, Kingston claims he reviewed the phone logs and found that Plaintiff's log showed significant usage in violation of his phone restriction. Id. at 24. Plaintiff questions the veracity of Kingston's claim that he did not notice the phone usage until that day, asserting that, since Kingston admitted to reviewing phone logs three out of every five days he worked, he would have noticed before April 23 if Plaintiff's log had indeed shown such significant, long-term usage over an 8-day period. Pl.'s SMF at 6.

3

When Defendant Hanson came on duty the day of April 23, 2016, Kingston claims he asked Hanson to take Plaintiff to the special housing unit ("SHU") for a phone violation. Kearney & Kingston SMF ¶ 25. Kearney claims that Hanson then approached him, showed him a picture of Plaintiff, and asked if he knew who Plaintiff was. Id. ¶ 26. Apparently recognizing Plaintiff as the inmate who had asked to use the phone the day prior, Kearney described the incident to Hanson and wrote a memorandum describing the alleged interaction. Id. ¶¶27–29. Plaintiff claims that Kearney could not have recognized him from the picture, because Plaintiff did not interact with Kearney on April 22, 2016, and was not the inmate who requested to use the phone that day. Pl.'s SMF at 6.

At some point later on April 23, 2016, Defendants Hanson and Robideau came to Plaintiff's dorm and instructed him to come with them. Pl.'s SMF ¶ 9. The two officers did not tell him why he was being transferred or where he was going, but handcuffed Plaintiff and placed him in a van. Id. ¶ 10. The ride in the van took between 5 and 7 minutes. Robideau SMF ¶ 6; Pl.'s SMF at 41.

Plaintiff contends that during the ride in the van, Robideau began punching and kicking him while he was still handcuffed, saying "our buddy told us to give you the special treatment." Id. ¶ 11. Plaintiff further contends that upon arriving at the SHU, he was so severely injured that he could not walk on his own and had to be dragged out of the van and assisted into the building. Pl.'s SMF ¶ 12. Robideau denies that he assaulted Plaintiff in the van or that Plaintiff had to be helped into the SHU building. Robideau Reply SMF at 8–9.

### 2. The Alleged Assault in the Special Housing Unit

The parties' accounts vary dramatically regarding what happened once Plaintiff entered the SHU.

Plaintiff claims he was placed in the SHU strip-frisk room together with Defendants Hanson, Robideau, Sharpe, Mere, and another unidentified officer. Pl.'s SMF ¶¶ 13–14. Plaintiff claims Hanson said "this nigger gets special treatment because he filed a lawsuit against one of our brothers" before punching him in the head and taking him to the ground. Pl.'s SMF ¶¶ 15–16. Plaintiff then claims the other officers in the room joined in kicking and punching him. Id. ¶ 17. Plaintiff claims he heard one officer state "lets [sic] say he had a weapon" and another state "lets [sic] say he assaulted one of us." Id. ¶ 18. According to Plaintiff's account, Plaintiff was so severely injured he could not stand, and officers had to help him lean against a wall. Id. ¶ 20. Nurse Harmon then came to examine Plaintiff; Plaintiff asked for pain medication, but she told him to sign up for sick call. Id. ¶ 21; Mere SMF ¶ 17. Plaintiff alleges that Hanson then said Plaintiff looked like he wanted to hurt himself and needed to be placed on suicide watch. Pl.'s SMF ¶ 22. Once Plaintiff was escorted and placed in the suicide watch cell, Plaintiff alleges Hanson grabbed him by the neck and told him "if I hear anything about this, it can all happen again." Id. ¶ 23.

However, Robideau claims he did not enter the SHU with Plaintiff at all, but instead left once Plaintiff entered the SHU building. Robideau Reply SMF ¶ 13–14. Defendant Mere likewise claims that he was never in the SHU strip-frisk room with Plaintiff, but rather was on duty in the gym. Mere Reply SMF ¶ 14, Mere SMF ¶¶ 6, 13. Mere further claims he did not enter the SHU until after Plaintiff was already in the suicide watch cell, because Mere had been assigned to cover the 1:1 suicide watch over Plaintiff, Mere Reply SMF ¶¶ 21–22, and that he was never informed or aware of the use of force in the SHU strip-frisk room, Mere SMF ¶ 24.

Plaintiff claims the Defendants each know Brian Cowan, the officer at Franklin Correctional Facility against whom Plaintiff had a lawsuit pending (the "Cowan Suit"), and

assaulted him in retaliation for filing the lawsuit. Pl.'s SMF at 14, 31, 35. Defendants each deny

any association with or knowledge of Cowan or the lawsuit. Robideau Mem. at 17; Peck SMF ¶

15; Mere SMF ¶ 55; Kearney & Kingston SMF ¶¶ 66, 67.

### 3. Plaintiff's Requests for Medical Aid

Plaintiff asserts that while in the 1:1 cell, he was in severe pain and was having difficulty

breathing. Pl.'s SMF ¶ 24. He further claims that, although Mere was supposed to be watching

him, he was not at his post. Id. ¶ 25. Plaintiff began kicking the door to get Mere's attention and

request his asthma inhaler. Id. ¶ 26. Mere allegedly appeared after ten minutes and said he would

"look into" it. Id. at 27. After over an hour with no word about his inhaler, Plaintiff again began

kicking the door to get Mere's attention. Id. ¶¶ 27, 28. A different officer arrived, but refused to

help. Id. ¶ 28. Plaintiff asserts he began kicking the door again. Id. ¶29. A third officer

responded, and shortly after, returned with a nurse and Plaintiff's asthma medication. Id.

Mere contends that he began his 1:1 watch over Plaintiff on April 23, at 4:05 PM, did not

leave his post until 10:20 PM, logged activity every 15 minutes, and that Plaintiff could see and

communicate with him that entire time. Mere Reply SMF ¶¶ 25–26. Mere claims that Plaintiff

was not only kicking the door, but yelling and slamming his body against it. Id. ¶ 26; Mere SMF

¶ 27. Mere claims Plaintiff engaged in this loud and disruptive behavior on at least 4 occasions,

and disregarded his orders to stop. Mere SMF ¶¶ 39–44. Further, Mere asserts Plaintiff only

asked for his inhaler one time, after which Mere responded he would "look into" getting it, and

that a nurse arrived shortly after with the medication. Mere Reply SMF ¶ 30, Mere SMF ¶¶ 31–

32. Mere claims that Plaintiff never complained of pain or requested medical aid. Mere SMF ¶

37.

The next day, on April 24, 2016, Plaintiff contends he was still in severe pain, but was

not given pain medication or breakfast. Pl.'s SMF ¶ 31–34. At 6:30 PM, Plaintiff asserts that he

still felt unwell and kicked the cell door again when he could not see an officer outside his cell. Id. ¶ 35–36. When Defendant Peck arrived to start his duty on the 1:1 watch over Plaintiff, Plaintiff claims he told Peck he was having a hard time breathing and was having an asthma attack. Id. at 37. Peck allegedly stated he would call the medical department, but after an hour with no help, Plaintiff again asked Peck for the asthma spray. Id. at 38. Plaintiff claims that Peck responded that he would have to wait, at which time Plaintiff began kicking the door again to get the attention of a sergeant. Id. at 39. Non-party Sergeant Tamer arrived, whereupon Plaintiff explained he was having trouble breathing and Tamer said he would get the spray. Id. 40–41. After an additional one and a half hours with no response, Plaintiff went to his cell door again, but Peck was not there. Id. ¶ 42–43. Plaintiff began kicking his cell door again. Id. ¶ 46. Another officer arrived and provided the inhaler 15 minutes later. Id. ¶ 46.

Peck claims that he did not know of the use of force incident that occurred the prior day. Peck SMF ¶ 13. Peck asserts that he visibly assessed Plaintiff, that everything seemed normal, and that Plaintiff did not ask for medical aid, but merely asked once when nurses would be making rounds. Peck SMF ¶ 16; Peck Dep. at 37. Afterward, Plaintiff began yelling, kicking, and hitting his body against the door. Id. at 38–39. Peck ordered Plaintiff to stop and requested that a roundsman inform a sergeant of the situation. Peck SMF ¶ 20–21. Peck claims that, at that point, Sergeant Tamer arrived and spoke with Plaintiff, after which Plaintiff calmed down. Id. ¶ 22–23. Around two hours later, Plaintiff resumed the same behavior. Id. ¶ 24. When Plaintiff did not comply with a direct order to stop, Peck issued a misbehavior ticket and Plaintiff stopped. Id. ¶ 25. Peck denies that Plaintiff ever said he was having chest pain or trouble breathing. Id. ¶¶ 27–28.

### 4. *Plaintiff's Hospital Treatment*

On April 25, two days after the alleged assault, Plaintiff claims he woke up with severe chest pain and trouble breathing. Pl.'s SMF ¶ 47. He informed officers he needed medical attention and was transferred to Alice Hyde Medical Center by ambulance. Id. ¶¶ 47–50. Plaintiff informed the medical staff he had been assaulted by corrections officers. Id. ¶ 54. Plaintiff was diagnosed with two fractured ribs and a collapsed lung caused by trauma which doctors stated "could have been fatal." Id. ¶¶ 53–56.

Plaintiff remained hospitalized until April 27, 2016, when he was released to the Upstate Correctional Facility ("Upstate") where he remained in the infirmary for another week. Id. ¶ 57.

### 5. Misbehavior Tickets and Investigations

After arriving at Upstate, Plaintiff was issued five misbehavior tickets. Pl.'s SMF ¶ 59. One ticket, issued by Hanson and co-signed by Kearney, alleged Plaintiff had made 18 phone calls from April 15, 2016 to April 22, 2016 in violation of his cube confinement status, and used the phones in violation of a direct order from Kearney. Id. ¶ 60. This ticket purported to justify Plaintiff's April 23, 2016, transfer to the SHU. Id. ¶ 59. Plaintiff denies making any phone calls or being ordered by Kearney not to use the phones, and was found not guilty at a hearing regarding this ticket. Id. ¶ 62.

Another ticket was issued by Defendant Sharpe, alleging that during the strip frisk at the SHU, Plaintiff resisted and violently struggled. Id. ¶ 63. Plaintiff was found guilty of this conduct. Id. ¶ 65.

Plaintiff received two tickets written by Mere alleging he created a disturbance while in the SHU on suicide watch. Id. ¶ 66; Mere Reply SMF ¶ 68. Plaintiff was initially found guilty of creating a disturbance, but this finding was reversed on appeal. Pl.'s SMF ¶ 69; Mere Reply SMF ¶ 69.

The final ticket was written by Peck, alleging Plaintiff created a disturbance while in the SHU on suicide watch. Pl.'s SMF ¶ 70, Peck Reply SMF ¶ 70. Plaintiff was found guilty of this conduct. Pl.'s SMF ¶ 71.

### 6. *Plaintiff's Grievance*

On May 13, 2016, Plaintiff submitted a grievance regarding the alleged assaults, his struggle to obtain medical care, and the allegedly false tickets filed against him. Pl.'s SMF ¶ 72. Kingston was tasked with investigating the grievance. Id. ¶ 76. Kingston dismissed Plaintiff's allegations, and found the grievance was baseless and filed only to cause harm to the officers involved. Id. ¶ 77–80. On August 8, 2016, Plaintiff's grievance was denied by Superintendent Uhler. Kearney & Kingston SMF ¶ 41.

However, the DOCCS Office of Special Investigations ("OSI") opened an investigation into the use of force event and Plaintiff's subsequent stay in the SHU. Mere SMF ¶ 58; Pl.'s SMF ¶ 81. The OSI investigator, Michael Germano, issued his report on January 3, 2017. See Birchenough Decl. Exhibit T ("Germano Report"). The Germano Report questioned the narrative told by staff regarding the assault and denial of medical care, finding various inconsistencies in their accounts regarding the nature of Plaintiff's resistance, the Nurse's evaluation of Plaintiff, their responses to his request for medical attention, and Plaintiff's physical state after being put on the 1:1 watch. Pl.'s SMF ¶¶ 82–87. The Germano Report did not reach a conclusion regarding Plaintiff's assault allegations, but found that the involved staff failed to give Plaintiff proper medical care after the use of force incident in the SHU. Id. ¶ 81.

Defendant Mere asserts that any findings in the Germano Report are irrelevant as to him because the report did not identify him as "involved staff," he was not interviewed or questioned, and was not named in the final report. Mere SMF ¶¶ 58–61. Similarly, Robideau argues that the

Germano Report supports his innocence because it found that he had "no valuable information to clarify the events documented in the use of force." Robideau Reply SMF ¶ 82.

### B. Procedural History

Following Plaintiff's filing of his Amended Complaint, and the Court's partial grant of Defendant Kearney and Kingston's motions to dismiss, Dkt. No. 100, Plaintiff has the following claims remaining: excessive force claims against Hanson, Sharpe, Robideau, Mere, Peck, Kearney, and Kingston under the Eighth Amendment, Fourth Amendment, and Fourteenth Amendment; claims for deliberate indifference to a serious medical need against Hanson, Sharpe, Robideau, Mere, and Peck under the Eighth Amendment; and retaliation claims against Hanson, Sharpe, Robideau, Mere, Peck, Kearney, and Kingston in violation of the First and Fourteenth Amendments.

Robideau, Mere, Peck, Kearney, and Kingston now move, respectively, for summary judgment arguing they are entitled to judgment as a matter of law on all claims against them. See Robideau Motion, Mere Motion, Peck Motion, Kearney Motion.

### III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of

fact could find in favor of the nonmoving party should summary judgment be granted."). The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to defeat a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), may not rely on mere conclusory allegations, speculation, or conjecture, Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020), and must present more than a mere "scintilla of evidence" supporting its claims, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

### A. Robideau Motion for Summary Judgment

Robideau argues there is no material issue of fact regarding Plaintiff's (1) Eighth Amendment claim for use of excessive force, (2) Fourth and Fourteenth Amendment claims for

use of excessive force, and (3) claim for retaliation, and asserts that all claims must be dismissed. See Robideau Mem.

### 1. Eighth Amendment Excessive Force

The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials. Wilson v. Seiter, 501 U.S. 294, 296–97 (1991). To establish an Eighth Amendment claim, a plaintiff must show both an objective component, "a deprivation that is objectively, sufficiently serious . . . [,]" and a subjective component requiring the defendant official have "a sufficiently culpable state of mind." Hayes v. Dahlke, 976 F.3d 259, 274 (2d Cir. 2020); see also Hudson v. McMillian, 503 U.S. 1, 7 (1992).

Plaintiff alleges that Robideau used excessive force against him by assaulting him in the back of the van while he was being transferred to the SHU and then by assaulting him again while in the SHU strip-frisk room. Pl.'s SMF ¶¶ 11, 14. Robideau argues there is significant evidence supporting his claim that he was the driver of the van and that he did not enter the SHU, and thus could not have assaulted Plaintiff. Robideau Mem. at 9–12. Robideau argues further that Plaintiff's self-serving testimony set forth on the record, absent other direct or circumstantial evidence, is insufficient to defeat summary judgment. Id.

#### a. Evidence Supporting Robideau's Version of Events

Robideau argues there is no dispute of material fact that, rather than being in the back of the van as Plaintiff claims, he was the driver of the van. He points to the DOCCS Escort Memorandum forms filled out by Robideau and Hanson that lists only two officers as having been involved in Plaintiff's transfer, Robideau SMF ¶ 10; Roberts Decl. Ex. H ("DOCCS Escort Memorandum"), and the deposition testimony of fellow defendant Sergeant Hanson, in which he stated that he (Hanson) was not driving the van, Robideau Reply at 7; Roberts Decl. Exhibit G

("Hanson Deposition") at 261. Further, Plaintiff has admitted that the driver of the van did not assault or speak to him. Pl.'s SMF at 41.

Robideau contends there is likewise significant evidence supporting his claim that he did not enter the SHU after dropping Plaintiff off. Robideau Mem. at 10. Robideau points to the SHU logbook which shows Robideau did not sign into the SHU building, but that Sergeant Hanson did upon arrival with Plaintiff, Roberts Decl. Exhibit I ("SHU Log Book"); the testimonies of Defendants Hanson and Sharpe that they were the only two officers in the strip-frisk room with Plaintiff that day, Hanson Dep. at 257, Roberts Decl. Exhibit J ("Sharpe Deposition") at 202; and the Germano Report, which found Robideau did not have any "valuable information to clarify the events" surrounding the use of force, Germano Report at 3.

Robideau argues that the only pieces of evidence on the record contradicting his account are Plaintiff's own self-serving statements made in his grievance, his deposition, and his declaration in opposition to summary judgment. Robideau Mem. at 7. Robideau argues his motion for summary judgment should be granted in spite of this contradictory evidence because "[i]t is clear in this Circuit that a nonmoving party's proffer of solely self-serving statements, 'without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment.'" Robideau Reply at 7 (quoting J.F. v. Carmel Cent. Sch. Dist., 168 F.Supp.3d 609, 616 (S.D.N.Y. 2016)).

> b. Sufficiency of Self-Serving Statements to Defeat Summary Judgment

The Court cannot agree that such clarity exists, and declines to adopt a blanket rule that a self-serving declarations or deposition testimony are per-se insufficient to defeat a motion for summary judgment, even without other evidence to support them.

Robideau is correct that there is a line of decisions from courts in the Southern District of New York that appears to adopt such a rule. See, e.g., Sec. & Exch. Comm'n v. Aly, 2018 WL 1581986, *9 (S.D.N.Y. 2018); J.F., 168 F.Supp.3d at 616; Fincher v. Depository Trust & Clearing Corp., No. 06-CV-9959, 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008). The provenance of the rule issued in these decisions can be traced back to the Second Circuit's opinion in Argus, Inc. v. Eastman Kodak Co., where the court held that, in the context of establishing a causal link between a breach of antitrust law and harm to a plaintiff-competitor, "when the fact of injury is in issue, the 'isolated self-serving statements' of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." 801 F.2d 38, 42 (2d Cir. 1986). However, in applying this standard to find no genuine issue of material fact regarding causation of injury, the Argus court refused to allow such statements to defeat summary judgment, not because of their nature as self-serving, but because the testimony was inherently "conclusory" and thus "[fell] woefully short of that necessary to outweigh the volume of contrary facts in the record." Id. at 45.

Robideau makes much of the Second Circuit's affirmation of one of the Southern District cases utilizing this rule: Fincher v. Depository Trust. However, even though the Second Circuit eventually affirmed the district court's ruling in Fincher, it disagreed with the district court's decision to use the above-described rule to discredit the plaintiff's testimony at the summary judgment stage because the plaintiff's statements were not conclusory or speculative. See Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) ("Fincher's testimony . . . is not conclusory or speculative, as was the plaintiff's testimony in the case relied upon by the district court in disregarding the remarks, . . . we decline to conclude at this stage of the proceedings that Fincher's testimony may be deemed discredited."). The Fincher court

14

eventually affirmed the grant of summary judgment, not because the plaintiff's testimony at issue was self-serving, but because it concerned statements made by a third-party who concluded the plaintiff had been discriminated against, and the alleged statements represented a mere "scintilla" of evidence "in light of their offhand, conclusory nature and the lack of further support in the record for Fincher's claim [of discrimination]." Id. at 727. However, the court stated that, if the plaintiff had testified that the third-party had made remarks that themselves were discriminatory, rather than merely conceding in conclusory fashion that plaintiff had been discriminated against, "[s]ummary judgment might not have been justified." Id. Heavily implying the Second Circuit would consider such self-serving testimony to be sufficient to defeat summary judgment.

In short, the Second Circuit—rather than holding that a self-serving statement is per se insufficient absent other supporting evidence—has reiterated the traditional standard that when ruling on summary judgment "[the] preliminary question for the judge [is] not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it," id. at 726 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986)), and that "[m]ere conclusory allegations, speculation or conjecture" are insufficient to resist summary judgment, Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir.1996). While it may be true that in some cases a party's self-serving affidavit or testimony, unsupported by other evidence on the record, will be insufficient to allow a reasonable jury to properly find a verdict in that party's favor, there are other circumstances where it may very well be sufficient.

> c.   Plaintiff's Record Testimony and Statements are Sufficient to Defeat Summary Judgment

Plaintiff's allegations regarding the alleged assaults by Robideau are not conclusory or speculative, rather, they testify to events that allegedly happened in Plaintiff's presence that he

observed directly. See Fincher, 604 F.3d at 726 ("Fincher's testimony . . . is not conclusory or speculative . . . because Fincher was testifying to the content of a conversation at which she was allegedly present."). Thus, the Court must determine if Plaintiff's repeated testimonial statements that Robideau assaulted him in the back of the van on the way to the SHU and assaulted him again in the SHU strip-frisk room represent a mere "scintilla" of evidence, insufficient to create an issue of material fact.

The Court finds the weight of evidence is not so great that no rational jury could credit Plaintiff's testimony and find in his favor. Robideau contends that there is "extensive documentary and testimonial discovery establishing that Robideau was the driver of the van." Robideau Mem. at 10. The only documentary evidence Robideau points to is the Escort Memorandum listing Robideau and Hanson as having been in the van during the transport. Escort Memorandum at 1. However, this memorandum is not purely objective evidence, but rather was created and signed by Robideau and Hanson themselves. Hanson Dep. at 258. Robideau further relies on Hanson's testimony that Hanson was not the one driving the van, thus implying that since there were only two officers in the van according to the Escort Memorandum, the driver must have been Robideau. Robideau Mem. at 10. While Hanson did testify that he does not generally drive the vans, Hanson Dep. at 261, he explicitly stated that he did "not have an independent recollection" of transferring Plaintiff to the SHU, and when asked if he drove the van on that specific day, Hanson responded "not that I recall," id. at 259. Given the nature of this evidence, a reasonable jury could still choose to credit Plaintiff's account that

16

Robideau was not the driver of the van, but was present in back of the van and assaulted him during the trip.[3]

Regarding the alleged assault in the SHU, Robideau asserts he did not enter the SHU at all and points to (1) the fact that he did not sign the SHU Logbook "when Sergeant Hanson did so upon arrival with Plaintiff," Robideau Mem. at 11 (citing SHU Logbook at 1), (2) Hanson and Sharpe's testimony that no other officers were present in the SHU strip-frisk room during the use of force event with Plaintiffs, id.; Hanson Dep. at 257; Sharpe Dep. at 201–02, and (3) the Germano Report's indication that "Robideau did not have any 'valuable information to clarify the events' documented in the use of force," id. (citing Germano Report at 3).[4]

This evidence is similarly not as conclusive as Robideau argues. The SHU Logbook entry for Plaintiff's admission has a designated place for the "escorting supervisor" to sign, but no obvious place where Robideau, who was indicated to be the "escorting officer" would have signed. See SHU Logbook at 1; Escort Memorandum. Robideau has not argued or established

---

[3] Robideau also argues for the first time in his reply papers that "[d]riving the van is an exclusive duty of the Rounds 1 position, or of the Rounds 2 position if Rounds 1 is unavailable" and "Robideau without dispute was the only available Rounds person to drive the van at the time of Lewis' transfer because his partner, the Rounds 2, was not available." Robideau Reply Mem. at 3. The Court will disregard these arguments and alleged facts because, as they were not included in Robideau's initial motion, Plaintiff has not had a chance to appropriately respond. See In re Various Grand Jury Subpoenas, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered. Generally, a court does not consider issues raised in a reply brief for the first time because if a party raises a new argument in a reply brief the opposing party may not have an adequate opportunity to respond to it.") (citations omitted).

[4] For the first time in his reply, Robideau makes the argument that he has conclusively established he was not in the SHU strip-frisk room during the assault because Nurse Harmon testified there were only two officers present in the room, and that Robideau had to find his partner for their assignment at 3:30 P.M.. Robideau Reply Mem. at 4, 7. Because these alleged facts and arguments are presented for the first time in Robideau's reply memorandum, and Plaintiff has not had an appropriate chance to respond, the Court will disregard them. See supra note 2.

that it would have been improbable, or even difficult, for him to enter the SHU without having signed. Indeed, the record indicates other individuals were able to enter and leave the SHU multiple times without signing the logbook. Germano Report at 3. In short, a reasonable jury could find other explanations for Robideau's lack of signature. Further, the conclusion in the Germano report that Robideau did not have relevant information was based on Robideau's own testimony. Germano Report at 3. Given the repeated consistent statements Plaintiff has made regarding the assault in the SHU, Birchenough Decl. Ex. N ("Plaintiff's Grievance") at 3; Plaintiff's Dep. at 122:6–11, a reasonable jury could choose to credit Plaintiff's testimony over Robideau's, Sharpe's, and Hanson's.

Robideau argues that Plaintiff's testimony should be discredited because he claimed to see Robideau behind him in the strip-frisk room with his "peripheral visions" and one cannot see behind themself with peripheral vision. Robideau Mem. at 11. Robideau further argues that Sharpe and Hanson's statements "should be given significant weight" because they admit they were the only ones in the strip-frisk room during the use of force, "and there is no reason for them to be untruthful about who else was in the SHU frisk area." Id. Robideau's arguments may hold merit, however such weighing of testimony and determination of credibility is not within the purview of a court on a motion for summary judgment. See Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

While the weight of evidence may favor Robideau, the evidence is not so conclusive that a reasonable jury could not believe Plaintiff's assertions that Robideau was in the back of the transfer van and in the SHU strip-frisk room and participated in the assaults. See Franklin v.

Oneida Corr. Facility, No. 03-CV-1452, 2008 WL 2690243, at *9 (N.D.N.Y. July 1, 2008)

(Kahn, J) ("As tempting as it may be to conclude that defendants will ultimately prevail at trial,

defendants' invitation to make a credibility determination and reject plaintiff's version of the

events on motion for summary judgment is plainly unwarranted"); Cicio v. Lamora, No. 08-CV-

431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010), report and recommendation adopted,

No. 08-CV-431, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010) ("Plaintiff's testimony that he

was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it

did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter

how weak plaintiff's claim may appear, presents a question of credibility that must be left to the

trier of fact"); see also Harris v. Miller, 818 F.3d 49, 65 (2d Cir. 2016) (holding summary

judgment is inappropriate where "a prisoner's allegations and evidentiary proffers could

reasonably, if credited, allow a rational factfinder to find that corrections officers used force

maliciously and sadistically . . . [even where] the proof of excessive force [is] weak.").

The Court thus declines to grant Robideau's motion for summary judgment regarding

Plaintiff's Eighth Amendment claim of excessive force.

### 2. Fourth and Fourteenth Amendment Excessive Force Claims Against Robideau

Plaintiff does not oppose Robideau's motion regarding his claims for excessive force

under the Fourth and Fourteenth Amendments. See Pl.'s Resp. Mem. at 14. Thus, the Court

grants Robideau's motion regarding these claims.

### 3. Eighth Amendment Deliberate Indifference to Serious Medical need Claim against Robideau

Plaintiff likewise does not oppose Robideau's motion regarding his claim for deliberate

indifference to a serious medical need under the Eighth Amendment. Id. Thus, the Court grants

Robideau's motion regarding this claim.

*4. First Amendment Retaliation Claim Against Robideau*

Robideau argues that Plaintiff's claims against him alleging retaliation should be dismissed, first, because Plaintiff did not appropriately exhaust his administrative remedies, and second, because there is no dispute as to material fact regarding whether Robideau engaged in retaliatory activities.

a. <u>Exhaustion of Administrative Remedies</u>

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002). "'Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules' as a precondition to filing a federal lawsuit." <u>Espinal v. Goord</u>, 558 F.3d 119, 124 (2d Cir. 2009) (quoting <u>Woodford v. Ngo</u>, 548 U.S. 81, 90 (2006)). Likewise, "compliance with state procedural rules is necessary to achieve '[t]he benefits of exhaustion [that] can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.'" <u>Id.</u> "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim,' because 'it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.'" <u>Id.</u> (quoting <u>Jones v. Bock</u>, 549 U.S. 199, 218 (2007)).

Robideau asserts that New York State grievance procedures require an inmate to "allege facts sufficient to put corrections officials on notice as 'to the nature of the claim,' and 'provide

enough information about the conduct' at issue." Robideau Mem. at 14. Robideau argues that because "[Plaintiff] failed to file a grievance with particularity that implicated Robideau in any retaliatory acts towards Lewis" he has not sufficiently exhausted his administrative remedies as to the retaliation claim against Robideau. See id. at 15.

However, Plaintiff's Grievance alleges involvement of specific officers, including Robideau, Pl.'s Grievance at 2–3, and that he was beaten for retaliatory reasons, id. at 18 ("This is a case where I was severely beaten . . . in retaliation for filing a lawsuit against correction officer B. Cowan."). Plaintiff's Grievance also provides a detailed account of the events, including a specific date, time, and location. Plaintiff's Grievance at 13–15.

Thus, Plaintiff's Grievance provided prison officials with the "the necessary information to investigate the complaints and the opportunity to learn which officers were involved in the alleged incident" sufficient to advance the benefits of exhaustion, and the Court finds Plaintiff has exhausted his administrative remedies regarding the claim of retaliation against Robideau. See Espinal, 558 F.3d at 127 (finding administrative remedies properly exhausted where grievance alleged involvement of certain security officers and "included the specific date, time, and location of the incident about which he complained, and that he was beaten for retaliatory reasons.").

### b. Robideau's Alleged Retaliatory Acts

In order to succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis v. Goord, 320 F.3d 346, 325 (2d Cir. 2003); see also Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004).

It is undisputed that filing a civil lawsuit is activity protected by the First Amendment. Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 152 (2d Cir. 2006) ("[L]awsuits are protected speech."); see also Houston v. Zen Zen, 388 F.Supp.2d 172, 174 (W.D.N.Y.2005).

An action is considered to be adverse if it "would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." Tafari v. McCarthy, 714 F.Supp.2d 317, 348 (N.D.N.Y. 2010). Robideau argues that there is no material dispute of fact that he did not take any adverse action against Plaintiff because he was driving the van and did not enter the SHU. Robideau Mem. at 18. Robideau essentially reiterates his argument above, stating that documentary and testimonial evidence establishes his non-involvement, and the Court should disregard evidence to the contrary because it consists of "unsupported, self-serving statements that have not been corroborated." Id. However, as above, the Court finds that a reasonable jury could choose to credit Plaintiff's statements that Robideau assaulted him in the back of the transfer van and in the SHU. See supra Section IV(A)(1). It cannot be disputed that a physical assault on a handcuffed prisoner of the type alleged by Plaintiff would deter an individual of ordinary firmness from exercising constitutional rights. See Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) ("[Plaintiff's] claim regarding the retaliatory assault sufficiently describes adverse conduct that would deter a reasonable inmate from exercising his constitutional rights."); Flemming v. King, No. 14-CV-316, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016) ("[A] physical assault constitutes adverse action."), report and recommendation adopted, No. 14-CV-0316, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016).

Thus, there is a material dispute of fact as to whether Robideau undertook an adverse action.

Robideau further argues that, even if it is accepted that he participated in the assaults, there is insufficient evidence on the record to establish a causal connection between Plaintiff's filing of the Cowan Suit and the assaults. Robideau Mem. at 16.

In determining whether a causal connection exists between a plaintiff's protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation."[5] Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing Colon v. Coughlin, 58 F.3d 865, 872–73 (2d Cir. 1995)).

Notwithstanding the first three factors, the Court finds that alleged statements made by Robideau are sufficient for a reasonable jury to conclude the assaults were connected to the Cowan suit.

Plaintiff claims that while assaulting him in the back of the van, Robideau stated "our buddy wants us to give you the special treatment," Pl.'s Grievance at 13, and that during the alleged attack in the SHU, one officer stated "our buddy wants us to give a nigger like you the special treatment" and "this nigger gets the special treatment because he filed a lawsuit against one of our brothers," id. at 14. Robideau claims he does not know Officer Cowan and did not make these statements, and a jury could choose to disbelieve Plaintiff's claims, but they are sufficient to create a material issue of fact regarding Robideau's retaliatory motive. See Colon, 58 F.3d at 873 (reversing grant of summary judgment where prisoner presented direct evidence

---

[5] The court notes that factors (ii) and (iii) are generally employed when an inmate claims a prison disciplinary or administrative action is taken in retaliation, see, e.g., Faulk v. Fisher, 545 F. App'x 56, 59 (2d Cir. 2013); Morris v. Rabsatt, 2012 WL 976035, at *7 (N.D.N.Y. 2012), and are of dubious relevance when an inmate claims security officers have physically assaulted him.

of causal connection in the form of an alleged admission of retaliatory motive by defendant
prison official, despite defendant's denial on the record of ever making the statement.)

Therefore, the Court finds there are issues of material fact regarding whether Robideau
retaliated against Plaintiff for exercising his First Amendment rights and denies Robideau's
motion for summary judgment on this claim.

### B.  Mere Motion for Summary Judgment

Mere argues he is entitled to summary judgment on (1) Plaintiff's claim for use of
excessive force, (2) Plaintiff's claim for deliberate indifference to a serious medical need in
violation of the Eighth Amendment, and (3) Plaintiff's claim of retaliation in violation of the
First Amendment. See Mere Mem. at 1. Mere also argues that he is entitled to qualified
immunity. Id.

### 1. Eighth Amendment Excessive Force Under 42 U.S.C. § 1983 as to Mere

"It is well settled in this Circuit that 'personal involvement of defendants in alleged
constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Brandon v.
Kinter, 938 F.3d 21, 36 (2d Cir. 2019) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir.
1994)).

Mere alleges it is "undisputed" that he was not personally involved in the assaults on
Plaintiff, because the record establishes that he was in the gym when Plaintiff was allegedly
assaulted in the SHU.[6] Mere Mem. at 7–9. To support this claim, Mere points to (1) his own
deposition testimony as well as that of Defendants Hanson and Sharpe which each claim that
only Hanson and Sharpe were in the SHU room when the use-of-force event occurred, id. at 8;
Mere Dep. at 55; Hanson Dep. at 91–92; Sharpe Dep. at 122–123; (2) Birchenough Decl. Ex. I

---

[6] It is undisputed that Mere was not present in the van during the alleged assault on Plaintiff
during his transfer to the SHU. Pl.'s SMF at 18.

("Use of Force Report"), Birchenough Decl. Ex. H ("Unusual Incident Memorandum"),

Birchenough Decl. Ex. K ("Sharpe Inmate Misbehavior Report"), and the Germano Report,

which each show that the use-of-force event occurred around 3:10 P.M. on April 23, 2016; (3)

Mere's deposition testimony, declaration, and the DOCCS Staff Planning Grid from April 23,

2016 purportedly establishing that Mere was in the gym at 3:10 P.M. that day, Mere Dep. at 51,

Mere Decl. Ex. A ("DOCCS Staff Planning Grid"); and (4) the fact that the Germano Report

created after the OSI investigation did not identify Mere as "involved staff" or present during the

use-of-force event. See Germano Report. Mere also contends that Plaintiff's Amended

Complaint does not allege he was involved in the use-of-force event in the SHU, and that

Plaintiff's Grievance likewise does not state Mere was in the SHU room during the assault and

only mentions him for the first time after Plaintiff was placed in his SHU cell. Mere Mem. at 7–

8.

However, contrary to Mere's assertions, Mere's non-presence in the SHU during the

assault is explicitly disputed on the record. Plaintiff testified several times during his deposition

that Mere was present in the SHU strip-frisk room during the assault, along with Robideau,

Sharpe, Hanson and another unidentified officer, and that all the officers present assaulted him:

> Q. Okay. Was Officer Mere one of the individuals who assaulted you once you
>    got to the SHU to the strip frisk room?
> A. I believe he was.
> Q. I'm sorry?
> A. I believe he was because he was in the room with them.
> Q. He was in the strip frisk room?
> A. Yes.
> . . .
> Q. Okay. Was he one of the ones that assaulted you?
> A. All of them assaulted me.

Pl. Dep. at 199–200; see also id. at 204, 223, 224. Likewise, in Plaintiff's Declaration, Plaintiff

alleges that Mere assaulted him in the SHU. Pl.'s Decl. at 13–19.

The question then is whether this testimony is sufficient to create an issue of material fact, or whether it is nothing more than a mere scintilla of evidence. The Court find that Plaintiff's testimony is sufficient to withstand summary judgment.

Mere appears to argue that Plaintiff's Grievance contradicts his later statements that Mere participated in the SHU assault because the grievance does not name Mere specifically until Plaintiff describes events that occurred while he was in the SHU cell. Mere Mem. at 8.

Where a plaintiff "relies almost exclusively on his own testimony, much of which is contradictory and incomplete[,]" and the account is so contradictory that "no reasonable person could believe [it]," summary judgment may be appropriate. Jeffreys v. City of N.Y., 426 F.3d 549, 554–55 (2d Cir. 2005). It is true that Plaintiff's Grievance does not name Mere as one of the officers present in the SHU strip-frisk room and that Plaintiff relies almost exclusively on his own testimony to establish Mere's presence there. However, the Court does not find that the grievance inherently contradicts Plaintiff's later statements regarding Mere's participation. The grievance states there were several officers in the strip-frisk room during the assault and that "all the officers in the room started kicking and punching." Pl.'s Grievance at 3. The Court does not find this statement, or the allegations in Plaintiff's Complaint, so contradictory that no reasonable person could believe Plaintiff's account.

Further, much of Mere's argument relies on the Staff Planning Grid to establish that it was "physically impossible" for him to be in the SHU at the time of the use-of-force event, as well as on the testimony of other officers and the Germano Report. Mere Mem. at 8. However, an assignment to a specific area does not conclusively establish that Mere was physically present in that area at the specified time. And a reasonable jury could choose to believe Plaintiff's

account over the Staff Planning Grid, the defendant officers' testimonies, and the Germano Report, which was itself largely based on the parties' statements. Germano Report at 1–4.

While the weight of the evidence may favor Mere, a reasonable juror could credit Plaintiff's account, and the weighing of conflicting evidence is more properly left to the jury. Telesford v. Tamer, No. 14-CV-1209, 2016 WL 11480163, at *4 (N.D.N.Y. Aug. 31, 2016) ("Resolving the discrepancy between the parties' competing evidence would require the court to undertake a credibility determination that is not appropriate on summary judgment."). Thus, the Court denies Mere's request for summary judgment as to Plaintiff's Eighth Amendment excessive force claim.

### 2. Eighth Amendment Medical Indifference as to Mere

To establish an Eighth Amendment violation due to medical indifference, an inmate must prove "deliberate indifference to [his] serious medical needs." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The deliberate indifference requirement has both an objective and subjective prong. St. Clair Jones v. Lamont, 379 Fed. Appx. 58, 59 (2d Cir. 2010). Mere only argues that Plaintiff has not satisfied the subjective prong. See Mere Mem. at 9–12.

The subjective prong requires that a defendant prison official act with a sufficiently culpable state of mind. They must "know[] of and disregard[] an excessive risk to inmate health or safety." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). In other words, they must "act[] or fail[] to act 'while actually aware of a substantial risk that serious inmate harm will result.'" Acosta v. Thomas, 837 Fed. Appx. 32 (2d Cir. 2020) (quoting Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006)).

27

Mere argues that the record establishes he was not aware of the use-of-force event in the SHU, and thus had no knowledge of any excessive risk of injury, and that Plaintiff only requested his inhaler once, after which it was promptly provided to him—therefore, Mere did not act indifferently. Mere Mem. at 11–12.

However, as noted above, a reasonable jury could choose to credit Plaintiff's account of events, and that account relates a considerably different story. Plaintiff alleged on the record that Mere was not only aware of the use of force in the SHU, wherein five officer allegedly "beat[] up and kick[ed]" Plaintiff while on the ground, but participated as well. Pl.'s Dep. at 199:25–201:5. Shortly after the alleged attack, when Plaintiff had been placed in his SHU cell, Plaintiff claims he informed Mere that he could not breathe and feared he was having an asthma attack. Id. at 209:3–209:8; Pl.'s Decl. ¶ 28. A reasonable jury could conclude that knowledge of a brutal assault on Plaintiff combined with Plaintiff's statements shortly afterward that he couldn't breathe put Mere on notice of an excessive risk to Plaintiff's health. Baumann v. Walsh, 36 F. Supp. 2d 508, 513 (N.D.N.Y. 1999) ("[I]f [the defendants] were aware of [p]laintiff's injuries and subsequent pain at the time those injuries occurred, yet failed to provide access to necessary medical care or treatment, then an Eighth Amendment violation would be established despite the fact that medical treatment was later received.").

Likewise, a dispute as to material fact exists regarding whether Mere reacted with indifference to this excessive risk. While Mere claims Plaintiff was given his inhaler "within a reasonable time" after allegedly saying he couldn't breathe, Mere Mem. at 11–12, the record evidence Mere references to support his argument that this fact is undisputed instead shows the opposite. Mere cites to Plaintiff's deposition testimony, yet in that testimony, Plaintiff states that when he informed Mere he needed his inhaler, Mere said he would "look into it" but never

provided assistance, and Plaintiff did not get his inhaler until hours after asking Mere (and then only when a different officer arrived). Pl.'s Dep. at 209:3–209:8, 215:9–215:16. Mere also cites the Germano Report, which states that Plaintiff attempted to gain the attention of "the officer assigned to the watch" but he was met with "negative results" and did not get his inhaler until "approximately one hour later." Germano Report at 1. The Germano Report also found that "[Plaintiff] made several complaints of rib pain and difficulty breathing immediately following the incident" and "involved staff failed to give [Plaintiff] proper medical care immediately after the Use of Force occurred and the following day." Id. at 1, 4.

Indeed, Mere's alleged failure to provide assistance to an inmate struggling to breathe, shortly after participating in a violent assault on that inmate, could reasonably be inferred to be, not only indifference to a serious medical need, but an intentional delay in access to medical care. See Estelle v. Gamble, 429 U.S. 97, 104–05 (1976) (finding deliberate indifference to serious medical need standard met where "prison guards . . . intentionally deny[] or delay[] access to medical care."); Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir.1984) (denying summary judgment on claim for medical indifference where some evidence suggested defendants delayed emergency medical aid).

Because there are disputes as to material facts regarding whether Mere was aware of an excessive risk to Plaintiff's health, and whether Mere acted with deliberate indifference to that risk, the Court denies Mere's motion for summary judgment as to Plaintiff's claim for deliberate indifference to a severe medical need.

### 3. Retaliation as to Mere

As stated above, to succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the

defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis v. Goord, 320 F.3d 346, 325 (2d Cir. 2003); see also Gill v. Pidlypchak, 389 F.3d 379 (2d Cir. 2004).

It is undisputed that the filing of a lawsuit constitutes protected conduct. See Mere Mem. at 16. Mere instead argues that his conduct does not constitute an adverse action and there was no causal connection between the alleged conduct and the protected activity. See id. at 16–18.

Plaintiff alleges three actions that could constitute retaliation by Mere: Mere's alleged participation in the assault in the SHU strip-frisk room, Mere's denial of adequate medical care, and Mere's issuance of misbehavior reports.

### a.  SHU Strip-Frisk Assault

The Court has already determined that issues of material fact exist regarding whether Mere participated in the alleged assault in the SHU strip-frisk room. See supra Section IV(B)(1). Similar to the assault allegedly perpetrated by Robideau, the physical assault allegedly perpetrated by Mere is sufficient to constitute an adverse action that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights. See Baskerville v, 224 F. Supp. 2d at 732.

Mere argues that Plaintiff "offers only conclusory evidence" to support his claim of a causal connection between Mere's alleged actions and the Cowan Suit. See Mere Mem. at 14. While much of the evidence presented by Plaintiff regarding Defendants' knowledge of the Cowan suit is indeed conclusory or speculative, Plaintiff has also provided direct evidence of a causal link. A reasonable factfinder could credit Plaintiff's account that an officer stated during the assault in the strip-frisk room that they wanted Plaintiff to receive "special treatment because he filed a lawsuit against one of our brothers," Pl.'s Dep at 187:24–188:5; 200:8–200:17, and

that Mere participated in that assault. If believed, this is sufficient to create an inference of

causation between the protected activity and the alleged assault, even if it is not conclusively

established that Mere himself is the one who made the statement. See Roland v. McMonagle,

No. 12-CV-6331, 2015 WL 5918179, at *5–6 (S.D.N.Y. Oct. 9, 2015) (finding summary

judgment on retaliation claim unwarranted where evidence supported an "inference of causation"

between filing of grievances and assault by multiple corrections officers because one had

"mocked [plaintiff] for filing a grievance during the alleged attack").

### b.  Denial of Adequate Medical Care

A denial of medical care in the face of great pain or need, as is alleged by Plaintiff and

supported on the record, constitutes an adverse action sufficient to establish a claim for

retaliation. See Abreu v. Lipka, 778 F. App'x 28, 33 (2d Cir. 2019) ("[W]ithholding of

medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary

firmness' from exercising his rights.").

As stated above, a reasonable factfinder could find that Mere's alleged assault was

motivated by Plaintiff's filing of a suit against Cowan. Given that Plaintiff' Grievance states the

denial of medical care initially occurred only thirty minutes to an hour after Mere supposedly

took part in an assault on Plaintiff, Pl.'s Grievance at 6, which itself was allegedly explicitly

undertaken in retaliation for the filing of the Cowan suit, see Pl.'s Dep at 187:24–188:5; 200:8–

200:17, a factfinder could reasonably infer that this adverse-action was similarly motivated.

Roland, 2015 WL 5918179, at *5–6 ("[S]ummary judgment is unwarranted if the evidence can

support an inference of causation.").

### c.   Issuance of Misbehavior Tickets

However, the Court finds that Mere's issuance of misbehavior tickets does not constitute an adverse action sufficient to deter a person of ordinary firmness from exercising his rights because the tickets were eventually dismissed and Plaintiff never suffered adverse consequences or repercussions. See Birchenough Decl. Ex. O–Q; compare Berry v. Tremblay, No. 20-CV-177, 2021 WL 1575951, at *4 (N.D.N.Y. Apr. 22, 2021) ("Courts in this district have routinely found the mere filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action.") (collecting cases), with Hayes v. Dahlke, 976 F.3d 259, 272–74 (2d Cir. 2020) (finding filing of false misbehavior report constituted adverse action where inmate-plaintiff spent time in keeplock as a result), and Gill v. Pidlypchak, 389 F.3d 379, 384 (2d Cir. 2004) (finding adverse action where inmate-plaintiff spent three weeks in keeplock as a result of false misbehavior report.).

Plaintiff argues that he did suffer consequences because, while the misbehavior reports were eventually dismissed, he was initially found guilty and had to appeal the charges. See Pl.'s Resp. Mem. at 35. However, Plaintiff does not present any specific consequences or repercussions he faced as a result of the initial guilty finding or as a result of engaging in the appeals process. See id.

Therefore, the Court denies Mere's motion for summary judgment as to retaliation arising from Mere's alleged use of force in the SHU strip-search room and Mere's alleged denial of adequate medical care, but grants summary judgment as to retaliation arising from Mere's issuance of misbehavior reports.

### 4. Qualified Immunity as to Mere

In order to establish a defense of qualified immunity, a defendant public official must show that one of two conditions is satisfied, either "(a) the defendant's action did not violate

clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir. 2018); see also Green v. Montgomery, 219 F.3d 52, 59 (2d Cir. 2000). "The objective reasonableness test is met if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." Green, 219 F.3d at 59 (quoting Salim v. Proulx, 93 F.3d 86, 91 (2d Cir. 1996)). Summary judgment should not be granted on the basis of qualified immunity due to objective reasonableness "unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain v. Springer, 494 F.3d 108, 131 (2d Cir. 2007).

Mere does not argue that his actions did not violate clearly established law. See Mere Mem. at 18–20. He instead claims that his actions were objectively reasonable and he is thus entitled to qualified immunity as to the claims against him derived from his alleged use of excessive force and denial of adequate medical care. Id.[7]

Regarding the claims of excessive force and retaliation stemming from the alleged assault in the SHU strip-frisk room, Mere argues he is entitled to qualified immunity because he "was not present during the Use of Force Event . . . and therefore it was objectively reasonable that Officer Mere did not intervene in a Use of Force Event of which he had no knowledge." Id. at 18. However, Mere's presence and participation in the strip-frisk room assault is a contested and material issue of fact. Construing the record in the light most favorable to Plaintiff, a jury could reasonably credit Plaintiff's testimony that Mere participated in the assault and thus reasonably

---

[7] Mere also argues he is entitled to qualified immunity as to any claims arising from his issuance of misbehavior tickets. See Mere Mem. at 20. However, because the Court has already granted summary judgment for these claims, the Court will not address this argument.

find that it was not objectively reasonable for Mere to believe his actions did not violate
Plaintiff's Eighth Amendment rights. See Jeanty v. Cty. of Orange, 379 F. Supp. 2d 533, 542
(S.D.N.Y. 2005) (denying summary judgment where plaintiff's testimony created factual dispute
regarding defendants' use of excessive force, thus "jury could reasonably conclude that it was
not objectively reasonable for the individual defendants to believe that their actions did not
violate plaintiff's Eighth Amendment rights."); Brewer v. Kamas, 533 F. Supp. 2d 318, 331
(W.D.N.Y. 2008) (finding, where plaintiff alleged corrections officer used excessive force, that
"if the facts as alleged by Plaintiff are established at trial, no reasonable corrections officer could
reasonably believe he was not violating Plaintiff's constitutional rights.").

Mere also argues he is entitled to qualified immunity regarding claims of deliberate
indifference to a serious medical need and retaliation stemming from his alleged failure to
provide Plaintiff with his inhaler while on the 1:1 suicide watch. See Mere Mem. at 19. Mere
asserts it was objectively reasonable for him to not leave his post to personally retrieve the
inhaler and that "any reasonable officer similarly assigned to a one-on-one watch would engage
the use of other DOCCS officers such as the SHU Roundsmen . . . and would rely upon their
assistance to alert medical staff." Id.

However, construing the evidence in the light most favorable to Plaintiff, Mere's
assertions are heavily disputed. Plaintiff asserts that Mere participated in a vicious assault upon
him in the SHU and thus knew he had been severely beaten. Pl.'s Dep at 200:8–200:17. Shortly
after, Plaintiff claims he informed Mere he could not breathe, thought he was having an asthma
attack, and needed his inhaler. Pl.'s Grievance at 6. Rather than contacting other officers to get
medical aid, as Mere claims he did, Plaintiff asserts that Mere simply said he would "look into"
it, walked away, and never provided any sort of assistance. Id. at 6–7; Germano Report at 1; Pl.'s

Dep. at 209:3–209:8. Plaintiff claims he did not receive his inhaler until hours later, when he was able to contact another officer. Pl.'s Dep. at 215:11–215:16.

Again, the test for objective reasonableness is met "if officers of reasonable competence could disagree on the legality of the defendant's actions." Green, 219 F.3d at 59 (quotation marks omitted). Tellingly, Mere states that "*any* reasonable officer" in his position would have engaged the use of other officers to alert medical staff. Mere Mem. at 19 (emphasis added). Thus, Mere implies that if an officer acted as Plaintiff asserts, and never alerted medical staff or sought assistance, no officer of reasonable competence would agree that it was legal or proper.

A reasonable jury could credit Plaintiff's account and find it was not objectively reasonable for Mere to believe denying an inhaler to an inmate who had stated he couldn't breathe, especially after participating in an assault on that inmate, did not violate Plaintiff's right to medical care. Thus, the objective reasonableness of Mere's actions depends on a determination of factual questions that cannot be answered at the summary judgment stage of litigation. See Ellington v. Whiting, 807 F. App'x 67, 69–70 (2d Cir. 2020) (denying summary judgment on qualified immunity grounds where material issues of fact existed regarding whether defendants were aware of plaintiff's condition); Robinson v. Taylor, No. 16-CV-0285, 2017 U.S. Dist. LEXIS 137233 (N.D.N.Y. Aug. 24, 2017) (denying summary judgment on qualified immunity grounds where "resolution of the objective reasonableness of Defendants' actions 'depends on the determination of certain factual questions that cannot be answered at this stage of the litigation.'" (quoting Denton v. McKee, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004)).

## C.  Peck Motion for Summary Judgment

Peck moves for summary judgment on all claims against him, which include a claim of excessive force in violation of the Eighth Amendment, deliberate indifference to a serious

medical need in violation of the Eight Amendment, and retaliation in violation of the First Amendment.

### 1. *Excessive Force as to Peck*

Plaintiff does not oppose Peck's motion regarding his claims for excessive force. See Pl.'s Resp. Mem. at 14. Thus, the Court grants Peck's motion for summary judgment regarding any claims of excessive force.

### 2. *Deliberate Indifference to a Serious Medical Need as to Peck*

To establish an Eighth Amendment violation due to deliberate indifference to a serious medical need, an inmate must establish both an objective and subjective prong. St. Clair Jones v. Lamont, 379 Fed. Appx. 58, 59 (2d Cir. 2010).

Peck argues that he is entitled to judgment as a matter of law under both the objective and subjective prongs.

### a. Objective Prong

The objective prong of the deliberate indifference standard requires that "the alleged deprivation . . . be sufficiently serious." Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)). This determination in turn requires two further inquiries. Salahuddin v. Goord, 467 F.3d 263, 280, 279 (2d Cir. 2006). The first inquiry is "whether the prisoner was actually deprived of adequate medical care." Id. This inquiry turns on whether the defendant acted "reasonably" in response to an inmate's health risk or whether he failed "to take reasonable measure in response to a medical condition." Id. at 279–80. The second inquiry is whether the inadequacy in medical care is sufficiently serious. Id. at 280. "[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's

medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Id.

Peck does not dispute that Plaintiff's injuries were sufficiently serious as required by the second inquiry of the objective prong. See Peck Reply. Mem. at 4. Peck instead argues that the record evidence is insufficient to meet the first inquiry of the objective prong because he reacted reasonably. Peck Mem. at 14. Instead, Peck argues he was not aware of the use of force against Plaintiff or Plaintiff's physical condition, or that Plaintiff was having trouble breathing. Peck Mem. at 14. Peck further argues that, on the one occasion Plaintiff asked if he could have his inhaler, Peck acted reasonably by informing medical staff and contacting a supervisor. Id. at 14–15.

Plaintiff contends Peck must have known of the use of force against him, and thus knew of his injuries, because that morning "another officer in the SHU told Lewis he would not receive breakfast because he assaulted another officer." Pl.'s Resp. Mem. at 31. The Court finds that the mere fact that a different officer in the SHU, on duty at a different time of day, knew of the use-of-force incident involving Plaintiff, is entirely too speculative and conclusory to create a triable issue of fact as to whether Peck himself knew of the incident. See Fischer v. Forrest, 968 F.3d 216, 221 (2d Cir. 2020) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."). Even if the other officer's knowledge were imputed to Peck, the other officer seemed to believe Plaintiff was the assailant, and would not necessarily have known of any injuries Plaintiff had received. Plaintiff's Grievance at 7A (stating the officer said "no food for you because you assaulted a [sic] officer").

However, Plaintiff offers more than the speculative assertion above to support his claim that Peck knew of a serious risk to his health. Plaintiff testified that he informed Peck he was

having a hard time breathing and was having an asthma attack, but Peck did not do anything to

help. Pl.'s Dep. at 263:16–24; Pl.'s Grievance at 7B; Germano Report at 1–2. Plaintiff further

alleged that he requested his inhaler from Peck again, after an hour with no assistance, and Peck

told him he would "just have to wait." Pl.'s Grievance at 7B; Pl.'s Decl. ¶¶43–44[8]. According to

Plaintiff, he did not receive medical aid until an additional hour and a half had passed. Pl.'s

Grievance at 7C. Additionally, a reasonable jury could take into account the Germano Report,

which found Peck exhibited "a lack of care custody and control by departmental standards," to

find Peck did not act reasonably.

Further, the record belies Peck's assertion that he acted reasonably because he contacted

a supervisor in response to Plaintiff's request. Notably, Peck does not cite to any record material

to support this factual assertion. See Peck Mem. at 14. Indeed, Peck denied during his deposition

that he ever requested medical attention for Plaintiff, Peck Dep. at 43:2–43:8, Peck testified that

---

[8] Peck argues that Plaintiff has relied "almost exclusively on his Declaration to invent questions
of fact" in response to Peck's motion. Peck Reply Mem. at 5. Peck further argues that the Court
should disregard the assertions Plaintiff makes in his declaration because they contradict
Plaintiff's deposition testimony and are "replete with inconsistencies." Id. at 2. The Court
disagrees on both counts. Plaintiff's material assertions that he informed Peck he was having
trouble breathing and requested his inhaler multiple times find support, not only in Plaintiff's
Declaration, but in both his deposition testimony and the Germano Report. Pl.'s Dep. at 263:16–
24; Pl.'s Grievance at 7B. Further, while it is true that a declaration made in response to a motion
for summary judgment may be disregarded to the extent it contradicts past deposition testimony,
the two must be "actually contradictory." Palazzo v. Corio, 232 F.3d 38. 43 (2d Cir. 2000). The
Court does not agree that Plaintiff's Declaration is inconsistent with his deposition. Peck claims
that Plaintiff states Peck was not at his post in his declaration, but in the deposition, stated that it
was Mere who was not at his post. Peck Reply Mem. at 2. While Plaintiff does state that Mere
was not at his post in his deposition, Pl.'s Dep. at 208, he also states later that Peck was not at his
post the next day, id. at 265:6–8. Similarly, Peck argues it is inconsistent for Plaintiff to claim in
his later declaration that he did not receive his inhaler until after Peck did not respond, when he
admitted in his previous deposition that he received an inhaler before Peck even began his shift.
Peck Reply Mem. at 3. However, Plaintiff makes clear that, while he did receive his inhaler the
day before while Mere was on watch, he was still short of breath the next day, and thus requested
the inhaler again from Peck. Pl.'s Grievance at 7B; Pl.'s Decl. ¶¶ 31, 38.

when he contacted a roundsmen about getting a supervisor, he did not recall mentioning any

need for medical attention and "[t]he only thing [he] wanted to have the roundsman do was to

have a sergeant come down," id. at 46:14–47:2, Peck also testified he did not recall ever telling

Sergeant Tamer that Plaintiff had requested medical attention and did not contact medical

directly at any point, id. at 57:5–57:23.

Construing the evidence in the light most favorable to Plaintiff, the Court concludes that

a reasonable jury could find Peck knew Plaintiff was in severe medical need due to his inability

to breathe, but did not act to obtain aid, and thus did not act reasonably in response to Plaintiff's

requests. Therefore, Peck is not entitled to summary judgment under the objective prong of the

deliberate indifference standard.

### b.  Subjective Prong

The subjective prong of the deliberate indifference standard requires that a defendant

prison official act with a sufficiently culpable state of mind. They must "know[] of and

disregard[] an excessive risk to inmate health or safety." Hill, 657 F.3d at 122 (quoting Farmer v.

Brennan, 511 U.S. 825, 837 (1994)). In other words, they must "act[] or fail[] to act 'while

actually aware of a substantial risk that serious inmate harm will result.'" Acosta v. Thomas, 837

Fed. Appx. 32 (2d Cir. 2020) (quoting Salahuddin, 467 F.3d at 280).

Peck argues he did not know of and disregard an excessive risk to inmate health or safety

because he was not informed of Plaintiff's physical condition, he did not notice any injuries upon

beginning his assignment, and that Plaintiff testified that the extent of his medical request was

for an inhaler because he was having an asthma attack. See Peck Mem. at 15–16.

However, as stated above, a reasonable jury could credit Plaintiff's account and find that

he informed Peck he was having an asthma attack and was unable to breathe. Pl.'s Dep. at

263:16–24; Pl.'s Grievance at 7B; Germano Report at 1–2. Given Peck's deposition testimony, a reasonable factfinder could likewise find that Peck did not undertake any action to provide medical aid in response to Plaintiff's reports that he could not breathe. Peck Dep. at 43:2–8; 46:14–47:2; 57:5–23.

Thus, a factfinder could find Peck was aware of an excessive risk to Plaintiff's health, and that Peck disregarded it by failing to take any action to provide aid.[9] See Warren v. City of New York Dep't of Corr. Med. Staff, No. 17-CV-1125, 2021 WL 1163105, at *11 (E.D.N.Y. Mar. 26, 2021) (denying summary judgment where material dispute of fact existed regarding whether defendant provided plaintiff medical attention in response to asthma attack); Ennis v. Davies, No. 87-CV-1465, 1990 WL 121527, at *3 (S.D.N.Y. Aug. 14, 1990) (holding that a jury could reasonably find that inmate's request for his asthma medication was sufficient to make the defendants aware of a serious medical need and failure to provide medication constituted deliberate indifference).

---

[9] Peck argues that, to meet the subjective prong of the deliberate indifference claim against a non-medical official, "the plaintiff must establish that the official 'intentionally delayed access to medical care'" after the plaintiff made the problem known. Peck Mem. at 13. However, an examination of the higher court decisions from which this doctrine springs indicates that, while they consider showing intentional delay to be *sufficient* to establish deliberate indifference, they do not state that such a showing is *necessary* to establish deliberate indifference. See Estelle v. Gamble, 429 U.S. 97, 104–105 (1976) ("[D]eliberate indifference to serious medical needs of prisoners . . . [is manifested] by prison guards in intentionally denying or delaying access to medical care."); Archer v. Dutcher, 733 F.2d 14, 16 (2d Cir.1984) ("[I]f defendants did decide to delay emergency medical aid . . . in order to make Archer suffer, surely a claim would be stated under Estelle."). However, to the extent such a showing is necessary, the Court finds that a reasonable jury could find intentional delay here due to Peck's alleged complete inaction in the face of Plaintiff's statements he was having an asthma attack and could not breathe. See Baumann v. Walsh, 36 F. Supp. 2d 508, 512 (N.D.N.Y. 1999) (finding dispute of material fact regarding whether defendants intentionally delayed care where evidence showed they ignored plaintiff's complaints and refused medical care).

Thus, because there are disputes as to material facts regarding whether Peck acted reasonably and whether he knew of and acted with reckless disregard regarding an excessive risk to Plaintiff's health, the Court denies Peck's motion for summary judgment as to Plaintiff's claim for deliberate indifference to a serious medical need.

### 3.  Retaliation as to Peck

Plaintiff alleges Peck withheld proper medical treatment and filed a false misbehavior report against him as retaliation for his filing of the lawsuit against Cowan. Pl.'s Resp. Mem. at 36.

To succeed on a claim of retaliation in violation of the First Amendment, a plaintiff must show "(1) the conduct cited as the cause for retaliation is protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected conduct and the adverse action." Davis, 320 F.3d at 325; see also Pidlypchak, 389 F.3d at 380. In determining whether a causal connection exists between a protected activity and a prison official's actions, a court may consider several factors including "(i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." Baskerville, 224 F. Supp. 2d at 732 (citing Colon, 58 F.3d at 872–73 (2d Cir. 1995)).

Peck argues there is insufficient evidence on the record to establish a causal connection between his alleged actions and any retaliatory animus. See Peck Mem. at 22. In response, Plaintiff asserts that there is sufficient circumstantial evidence to infer a causal connection due to the temporal proximity between the protected conduct and Peck's alleged retaliatory conduct and

the due to fact that Bare Hill is close geographically to Franklin, the facility where Cowan worked. See Pl.'s Resp. Mem. at 38–39.

Regarding temporal proximity, the Court cannot agree that this factor meaningfully supports a causal connection in this case. Peck's alleged actions took place around ten months after Plaintiff filed the Cowan Suit. Noonan Decl. Ex. 13. While the Second Circuit "has not drawn a bright line to define the outer limits" of temporal proximity in retaliation cases, Gorman–Bakos v. Cornell Co-op Ext. of Schenectady Cty., 252 F.3d 545, 554 (2d Cir.2001), a gap of ten months is somewhat longer than most that are found to support a causal connection. See, e.g., Gorman-Bakos, 252 F.3d at 554 (finding five-month gap sufficiently short to support inference of causal connection); Espinal, 558 F.3d at 129 (finding six-month gap sufficiently short). However, it is relevant that the Cowan Suit was ongoing at the time of Peck's alleged retaliatory actions. See Cruz v. Lee, No. 14-CV-4870, 2016 WL 1060330, at *7 (S.D.N.Y. Mar. 15, 2016) (finding temporal proximity sufficient to support retaliation for filing lawsuit where lawsuit was ongoing). Given that the Cowan Suit was ongoing, but nothing occurred in the lawsuit near in time to the alleged retaliatory acts,[10] and the suit was filed ten months prior to the alleged acts, the Court finds this factor does not strongly favor, nor disfavor, an inference of causation.

Militating against a finding of causal connection, Plaintiff's prior disciplinary record could not be categorized as "good." It contains multiple infractions for violating direct orders and harassment, amongst others. See Mitchell Decl. Ex. D. Also, Plaintiff was eventually found guilty of the misbehavior ticket issued by Peck. Pl.'s SMF at 71.

---

[10] The only event Plaintiff points to in the Cowan Suit that happened near in time to these events is the denial of pro bono counsel in November 2016, five months after the alleged retaliatory events. Pl.'s Resp. Mem. at 38.

However, most significantly, Plaintiff's grounds for alleging a causal connection are too conclusory and speculative to create a triable issue of fact regarding Peck's alleged retaliatory motive. Plaintiff's main argument is that "there is ample evidence to conclude that Moving Defendants knew other officers at Franklin – a facility located in the same small town." Pl.'s Resp. Mem. at 39. Namely, Plaintiff references Peck's deposition testimony that when he goes to trainings, there would be officers from Franklin and Upstate Correctional there as well, Peck Dep. at 115:12–115:22, and that Defendants Kingston and Mere stated they would run into officers from Franklin at times, Kingston Dep. at 92:10–92:21, Mere Dep. 18:16–19:2.

Courts must be "careful to require non-conclusory allegations" when dealing with prisoner retaliation claims because they are "'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.'" Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003). Plaintiff did not file a suit or complaint against Peck himself. The mere fact that Peck works in the same general area as an officer against whom Plaintiff filed a lawsuit, and thus conceivably could have met that officer or others who know him, and in turn could have potentially acted in retaliation for a suit against that officer, is entirely too speculative and conclusory to create an issue of material fact. Even where officers have worked together in the same facility, allegations that one retaliated on behalf of another have generally been found conclusory and insufficient to withstand summary judgment absent other evidence of retaliatory motive. See Faulk, 545 F. App'x at 59 (finding allegations too conclusory to withstand summary judgment because "no evidence suggest[ed] that they were motivated by, or even aware of, [the] grievance," because defendants were not themselves named in the grievance and allegations they had retaliated on behalf of another officer in the same facility were merely "conclusory"); Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009)

(upholding summary judgment where plaintiff alleged retaliation for filing complaint regarding acts of other inmates and officials at same facility, but did not name defendant). This contrasts with cases where courts have found disputes of material fact to exist, even though a defendant was not directly named in a grievance or suit, because a direct connection was established between the defendant and the officer who was the target of the suit, or the defendant was alleged to have made statements referencing the grievance or suit. See Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995) ("If this circumstantial evidence represented the sum total of Colon's proof, we might be inclined to affirm the grant of summary judgment . . . [but Colon] also presents direct evidence of retaliation, namely, defendant Bezio's alleged admission of the existence of a retaliatory scheme."); Roland v. McMonagle, No. 12-CV-6331, 2015 WL 5918179, at *5 (S.D.N.Y. Oct. 9, 2015) (finding evidence sufficient to support inference of retaliatory motive where one defendant lived with the two officers who were the subject of the past grievance and "most significantly, [plaintiff] testified that a Defendant mocked him for filing grievances during the alleged attack"); Farid v. Goord, 200 F. Supp. 2d 220, 237 (W.D.N.Y. 2002) (finding issue of triable fact existed as to whether false misbehavior report was motivated by complaint against other officer where defendant knew of the complaint "well before the filing of the Misbehavior Report").

Because Plaintiff's allegations that Peck knew of and was motivated by the Cowan Suit are entirely conclusory and speculative, the Court grant's Peck motion for summary judgment as to Plaintiff's claims of retaliation.

### D.  Kearney and Kingston Motion for Summary Judgment

Defendants Kearney and Kingston argue they are entitled to summary judgment as to Plaintiff's claims for excessive force in violation of the Eighth Amendment, Retaliation in

violation of the First Amendment, and are entitled to qualified immunity. See Kearney &
Kingston Mem. at 7.

>    1.   *Excessive Force and Personal Involvement as to Kearney and Kingston*

Defendants Kearney and Kingston argue that they are entitled to summary judgment as to
Plaintiff's claim of excessive force because the record fails to establish that they were personally
involved in the constitutional violation. Id. at 8–13. Plaintiff responds by arguing that personal
involvement may be established by showing a defendant facilitated or attempted to cover up a
constitutional violation. Pl.'s Resp. Mem. at 21–22.

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that
each Government-official defendant, through the official's own individual actions, has violated
the Constitution." Ashcroft v. Iqbal, 556 U.S. 662 (2009) "To hold a state official liable under §
1983, a plaintiff must plead and prove the elements of the underlying constitutional violation
directly against the official without relying on a special test for supervisory liability." Tangreti v.
Bachmann, 983 F.3d 609, 620 (2d Cir. 2020).

Plaintiff cites several cases holding that if a defendant attempts to facilitate or cover up a
constitutional violation, that is sufficient to find that defendant personally participated in the
violation. See, e.g., Edwards v. Annucci, No. 17-CV-5018, 2019 WL 1284295, at *7 (S.D.N.Y.
Mar. 20, 2019) ("A prisoner's well-pleaded allegation that a defendant 'fil[ed] a false report to
his supervisors in order to cover up' constitutional violations will 'give rise to a plausible
inference' that the defendant 'was personally involved in the purported constitutional
violations.'") (quoting Randle v. Alexander, 960 F. Supp. 2d 457, 478 (S.D.N.Y. 2013)).
Additionally, this Court held in response to Kearney and Kingston's Motion to Dismiss, Dkt. No.
79, that these allegations of facilitation and cover-up were sufficient to establish personal
involvement, See Dkt. No. 100 ("Order on Motion to Dismiss") at 8–9. This would imply that if

the record now presented sufficient evidence that Defendants facilitated or attempted to cover up the use of excessive force, a reasonable jury could find they personally participated in the Eighth Amendment violation.

However, subsequent to the decisions Plaintiff cites and this Court's Order on Motion to Dismiss, the Second Circuit clarified the requirements for personal involvement in Tangreti.

In Tangreti, an inmate filed suit under 42 U.S.C. § 1983 alleging a prison supervisor displayed deliberate indifference to a risk of sexual abuse because the supervisor was grossly negligent in supervising the abusing officers. Id. at 616. The Second Circuit found that supervisory liability of this type violated the standard set forth in Iqbal, and that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. at 616. Further, '[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." Id. at 618 (quoting Iqbal, 556 U.S. at 676).

Thus, while previously many court's only required a § 1983 Plaintiff to establish a "tangible connection" between a defendant's acts and injuries suffered, see Miller v. Annucci, No. 919-CV-0030, 2019 WL 2370295 (N.D.N.Y. June 5, 2019) (Kahn, J.); Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008); in Tangreti, the court required the plaintiff to show "that [defendant] violated the Eighth Amendment by [defendant's] own conduct" and establish the elements of her Eighth Amendment claim directly against the defendant. Tangreti, 983 F.3d at 619.

While Plaintiff's allegations regarding excessive force against Kearney and Kingston do not allege supervisory liability, the reasoning in Tangreti applies with equal force here: Plaintiff must show that Defendants violated the Eighth Amendment by their own conduct, and establish

the elements of his Eighth Amendment claim for excessive force[11] directly against Kearney and

Kingston rather than relying on the conduct of other officers. See Quintin v. Cty. of Nassau, No.

18-CV-5852, 2022 WL 888950, at *3 (E.D.N.Y. Mar. 25, 2022) (applying Tangreti outside of

the supervisory context and stating that "it is well-settled that to establish liability under Section

1983, a plaintiff must 'plead and prove that each Government-official defendant, through the

official's own individual actions, has violated the Constitution'" (quoting Tangreti, 983 F.3d at

618));  Karelefsky v. Brann, No. 20-cv-9485, 2022 WL 624424, at *2 (S.D.N.Y. Mar. 1, 2022)

(observing that to find personal involvement and "hold a state official liable under § 1983, a

plaintiff must plead and prove the elements of the underlying constitutional violation directly

against the official." (citing Tangreti, 983 F.3d at 620)).

    As stated above, to establish an Eighth Amendment claim of excessive force, a plaintiff

must show both an objective and subjective component. "The objective component of a claim of

cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of

decency . . . when prison officials use force to cause harm maliciously and sadistically,

'contemporary standards of decency always are violated.'" Wright v. Goord, 554 F.3d 255, 268–

69 (2d Cir. 2009). The subjective component requires a plaintiff to show a defendant official had

---

[11] While Plaintiff made allegations in his Amended Complaint that "none of the [Defendants] took reasonable steps to protect [Plaintiff] from the objectively unreasonable and conscience shocking excessive force of the others, despite being in a position to do so," Plaintiff seems to have abandoned this argument regarding Kingston and Kearney and thus the Court will not address it. Kingston and Kearney specifically state in their motion for summary judgment that they are moving to dismiss all claims against them, Kearney & Kingston Mem. at 1, but Plaintiff did not argue in his response that they were liable due to a failure to protect. See generally Pl.'s Resp. Mem.; Pukhovich v. City of N.Y., No. 16-CV-1474, 2018 WL 4688943at *8 (E.D.N.Y. Sep. 27, 2018) (finding claims abandoned where complaint contained certain claim and defendants moved for summary judgment on "all" claims and neither party mentioned the cause of action in briefing); Singleton v. City of Newburgh, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998) (finding claim abandoned on summary judgment because it was not raised in the record after being asserted in the complaint).

"a sufficiently culpable state of mind." <u>Hayes v. Dahlke</u>, 976 F.3d 259, 274 (2d Cir. 2020); <u>see also</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992).

A corrections officer who knowingly facilitates an assault on an inmate could be found to have directly, through their own actions, deprived an inmate of his right to be free from cruel and unusual punishment by causing physical bodily harm in the same way an officer who directly participates in the assault deprives an inmate of such rights, and thus the facilitating officer has "used force" to cause harm maliciously. <u>C.f.</u> <u>Smith v. Levine</u>, 510 F. App'x 17, 20 (2d Cir. 2013) (finding complaint to have sufficiently alleged defendant's personal participation in constitutional violation where allegations created "obvious inference" that defendant's action was a "precursor" to the violative act). However, an officer who attempts to cover up an assault after the fact, while potentially committing other violations, may not have personally participated in cruel and unusual punishment in the same way such that a plaintiff could establish the elements of an excessive force claim against them directly.

Thus, because it is admitted neither Kearney nor Kingston participated directly in the alleged assaults on Plaintiff, the question before the Court is whether there is sufficient evidence on the record for a reasonable jury to conclude that Defendants knowingly facilitated the assault.

Plaintiff argues there is evidence showing Kearney made up the phone infraction and Plaintiff's request to use the phones out of whole cloth, thus facilitating the assault by establishing a pretext to transfer Plaintiff to the SHU. Pl.'s Resp. Mem. at 23. After being shown a picture of Plaintiff, Kearney informed Hanson that Plaintiff had asked to use the phone the day before in violation of his cube confinement restrictions. Pl.'s Resp. Mem. at 23; Kearney & Kingston SMF ¶ 15–16. Plaintiff disputes that he was the inmate who approached Kearney to make the call, Pl.'s SMF at 4; Pl.'s Resp. Mem. at 22, and there is evidence on the record that

could allow a reasonable factfinder to credit Plaintiff's account. Hanson did not remember ever showing Kearney a picture of Plaintiff. Pl.'s Resp. Mem. at 22. Additionally, evidence on the record indicates that another inmate was using Plaintiff's ID to make phone calls during the relevant time, Mitchell Decl. Ex. O ("Germano Deposition") at 76, and Plaintiff was found not guilty of the misbehavior ticket accusing him of making phone calls in violation of cube restrictions, Mitchell Decl. Ex. K at 59.

Making all reasonable inferences in Plaintiff's favor, a factfinder could reasonably credit his account and conclude that he did not ask Kearney for permission to use the phone on April 22, 2016. A reasonable factfinder could thus conclude Kearney was lying when, after seeing a picture of Plaintiff, he told Hanson Plaintiff was the one who asked to use the phone, and could infer from this dishonesty that Kearney did so to facilitate, or aid in the facilitation of, Plaintiff's transfer to the SHU.

 Plaintiff alleges Kingston facilitated the excessive use of force by initiating Plaintiff's transfer knowing and intending that Plaintiff be assaulted. See Pl.'s Resp. Mem. at 24. The alleged basis for the initial transfer of Plaintiff to the SHU was Kingston's review of Plaintiff's phone log that showed significant usage while Plaintiff was on cube confinement. Kingston SMF ¶ 24. It is undisputed that Plaintiff's phone log did indeed show significant usage while Plaintiff was restricted from using the phone. See Mitchell Decl. Ex M ("Phone Log"). However, the record establishes that Kingston reviewed the phone logs 3 out of 5 days every week he worked, Kingston Dep. at 38:9–16, would write a misbehavior report "as soon as he knew" of multiple improper calls made over more than one day, id., at 49:16–50:12, and would typically find out about such a violation within a day or two of it occurring, 50:13–50:18. However, despite this regular review and usual habit of writing misbehavior reports immediately, Kingston did not

write a misbehavior report for Plaintiff until after 18 calls had accrued over the course of 8 days. Pl.'s SMF ¶ 60.

A reasonable jury could conclude that Kingston did indeed notice the phone infraction prior to April 23, 2016, as he testified he generally would have, but did not write a misbehavior ticket immediately as was his usual practice. A reasonable jury could further infer the reason for delay was to facilitate Plaintiff's transfer to the SHU as a specific time on a specific day. Further, if a jury were to believe Plaintiff's account that he was assaulted on April 26 during and immediately after his transfer, it would not be unreasonable to infer that Kingston initiated the transfer on that day in order to facilitate the assault.

### 2. Retaliation as to Kearney and Kingston

Defendants argue that there is insufficient evidence on the record to establish that their actions were sufficiently adverse or that they were motivated by retaliation for Plaintiff's filing of the Cowan Suit. Kearney & Kingston Mem. at 13. Defendants also argue they would have undertaken the actions even in the absence of the protected conduct. Id.

#### a. Adverse Action

Plaintiff alleges that Kearney retaliated against him by supplying false allegations that supported a false misbehavior ticket and co-signing that ticket, and that both Kearney and Kingston retaliated by facilitating a retaliatory transfer knowing and intending that Plaintiff be assaulted. Pl.'s Resp. Mem. at 35.

The Court holds that, because Plaintiff was found innocent of the allegations in Kearney's allegedly false ticket, Pl.'s SMF ¶ 62, and thus suffered no adverse effects due to its issuance, this does not constitute an adverse action. See Tremblay, 2021 WL 1575951, at *4.

However, a retaliatory transfer to a facility with more restrictions constitutes an adverse action sufficient to discourage other inmates form exercising their rights, see Miller, 2019 WL

2370295, at *10, especially if that transfer is undertaken with the purpose of facilitating an assault upon an inmate, <u>Abreu</u>, 778 F. App'x at 33 ("[A] severe beating, false misbehavior reports, or the withholding of medication could constitute sufficiently adverse actions that would deter a prisoner of 'ordinary firmness' from exercising his rights.").

Thus, if a factfinder finds Defendant's facilitated Plaintiff's transfer to the SHU, intending that he be assaulted during said transfer, a reasonable jury could conclude they had undertaken adverse actions sufficient to support a claim of retaliation.

### b.   Causal Connection

Courts must be "careful to require non-conclusory allegations" when dealing with prisoner retaliation claims because they are "'easily fabricated,' and accordingly 'pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration.'" <u>Bennett</u>, 343 F.3d at 137. Plaintiff's main basis for asserting a retaliatory motive is that Defendants work in the same general area as an officer against whom Plaintiff filed a lawsuit, Cowan, and thus conceivably could have met him or others who know him. <u>See</u> Pl.'s Resp. Mem. at 39.

While the Court found this was insufficient to create an issue of material fact regarding retaliatory motive as to Defendant Peck, the Court finds differently with regard to Defendants Kearney and Kingston. This is so because, on summary judgment, the Court must review the record as a whole and make all favorable inferences in favor of the nonmoving party. <u>See</u> <u>Jasco Tools, Inc. v. Dana Corp.</u>, 574 F.3d 129, 152 (2d Cir. 2009) (stating that a court considering a summary judgment motion must view the record as a whole and "disregard all evidence favorable to the moving party that the jury is not required to believe" (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 135 (2000))); <u>Howley v. Town of Stratford</u>, 217

F.3d 141, 151 (2d Cir. 2000) ("In determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion . . . for a jury . . . would be entitled to view the evidence as a whole.").

On the record before the Court, it has already been determined that a reasonable factfinder could conclude that Kearney and Kingston acted to facilitate Plaintiff's transfer to the SHU for the purpose of his assault and that during and immediately after that transfer Plaintiff was indeed assaulted by other Corrections Officers who specifically stated they were doing so in retaliation for his filing of the Cowan Suit. Thus, a reasonable jury could infer that Defendants acted with a similar retaliatory motive.

### c. Action Undertaken in Absence of Protected Conduct

Even if a Plaintiff establishes that he engaged in protected activity, the defendant undertook an adverse action, and that there is a causal relationship, a defendant may still defeat liability if they can show by preponderance of the evidence that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." McRae v. Fischer, No. 9:17-CV-00146, 2017 WL 3535298, at *7 (N.D.N.Y. July 14, 2017) (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

Defendants argue that, because it is undisputed the phone log for Plaintiff's PIN showed numerous calls were made in violation of his cube restriction, there was an undisputed legitimate basis for their transfer of Plaintiff to the SHU, and thus there is no dispute as to any material fact regarding whether they would have undertaken the same action regardless of Plaintiff filing the Cowan Suit. Kearney & Kingston Mem. at 18. However, Plaintiff's claim is not merely that

Defendants transferred him, but that they did so at a specific time and date in order to facilitate his assault at the hands of other officers. See Pl.'s Resp. Mem. at 35, 40. Despite the phone logs, a reasonable jury could find that Defendants undertook their retaliatory actions on April 23, 2016 to facilitate an assault, and would not have done so absent a retaliatory motive. Indeed, Kingston's testimony indicates that, under most circumstances, an inmate who had made calls like Plaintiff was accused of doing would have been transferred much sooner. See Kingston Dep. 49:16–50:12.

### 3. Supervisory Liability Claims as to Kearney and Kingston

Kearney and Kingston argue that Plaintiff's claims for supervisory liability should be dismissed because they are no longer viable following the Second Circuit's decision in Tangretti. Kearney & Kingston Mem. at 20. Plaintiff does not contest this assertion, see Pl.'s Mem, and the Court agrees. Therefore, Kearney and Kingston[12] are granted summary judgment on any claims pressed against them based on supervisory liability.

### 4. Qualified Immunity as to Kearney and Kingston

In order to establish a defense of qualified immunity, a defendant public official must show that one of two conditions is satisfied, "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir. 2018); see also Green, 219 F.3d at 59. A public official's actions are objectively reasonable if "'officers of reasonable competence could disagree' on the legality of the defendant's actions." Green, 219 F.3d at 59 (quoting Salim, 93 F.3d at 91). Summary judgment should not be granted on basis of qualified immunity due to objective reasonableness "unless the defendant shows that no

---

[12] Supervisory liability claims will be dismissed against all other Defendants for the same reason and on the same grounds.

reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain, 494 F.3d at 131.

To establish qualified immunity, Kearney and Kingston rely on their previous arguments that their conduct did not, as a matter of law, violate Plaintiff's rights, asserting that therefore their actions were objectively reasonable and they are entitled to qualified immunity. See Kearney & Kingston Mem. at 22. However, the Court has found that a reasonable jury could conclude that both or either Defendant facilitated Plaintiff's transfer for the purposes of Plaintiff being assaulted, in violation of his Eighth Amendment right to be free of cruel and unusual punishment and in retaliation for his filing of the Cowan suit. See supra Sections IV(D)(1)–(2). Because inmates have a clearly established right not to be retaliated against for exercise of First Amendment rights, Burton v. Lynch, 664 F. Supp. 2d 349, 368-69 (S.D.N.Y. 2009) ("[A] claim of government retaliation for the exercise of First Amendment rights . . . alleges the violation of a clearly established right."), and have a clearly established right to be free from cruel and unusual punishment, and excessive, malicious use of force, Green, 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established."), a reasonable be jury could likewise conclude that Defendants' actions, allegedly facilitating these violations, were objectively unreasonable in light of clearly established law.

Thus, the Court finds Defendants Kearney and Kingston are not entitled to qualified immunity regarding Plaintiff's claims of excessive force and retaliation against them.

## V.   CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant Robideau's Motion for Summary Judgment, Dkt. No.136, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Robideau for

excessive force under the Fourth and Fourteenth Amendments, deliberate indifference to serious medical need under the Eighth Amendment, and any claims alleging supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Robideau for excessive force under the Eighth Amendment and retaliation survive Defendant Robideau's Motion; and it is further

ORDERED, that Defendant Mere's Motion for Summary Judgment, Dkt. No. 138, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Mere for excessive force under the Fourth and Fourteenth Amendments, retaliation in so far as it relates to issuance of misbehavior tickets, and supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Mere for excessive force under the Eighth Amendment, medical indifference under the Eighth Amendment, and retaliation related to use of force in the strip-frisk room and denial of adequate medical care survive Defendant Mere's Motion; and it is further

ORDERED, that Defendant Peck's Motion for Summary Judgment, Dkt. No. 137, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Peck for excessive force under the Fourth, Fourteenth, and Eighth Amendments, retaliation, and supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Peck for medical indifference under the Eighth Amendment survive Defendant Peck's Motion; and it is further

ORDERED, that Defendant Kearney's Motion for Summary Judgment, Dkt. No. 139, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Kearney for excessive force under the Fourth and Fourteenth Amendments and for supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Kearney for excessive force under the Eighth Amendment and for retaliation survive Defendant Kearney's Motion; and it is further

**ORDERED**, that Defendant Kingston's Motion for Summary Judgment, Dkt. No. 139, is hereby **GRANTED in part** and **DENIED in part**; Plaintiff's claims against Kingston for excessive force under the Fourth and Fourteenth Amendments and for supervisory liability are hereby **DISMISSED** from this action; Plaintiff's claims against Kingston for excessive force under the Eighth Amendment and for retaliation survive Defendant Kingston's Motion; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 31, 2022
              Albany, New York

LAWRENCE E. KAHN
United States District Judge